# Illinois Official Reports

## Supreme Court

*In re Pension Reform Litigation*, 2015 IL 118585

| | |
|---|---|
| Caption in Supreme Court: | *In re* PENSION REFORM LITIGATION (Doris Heaton *et al.*, Appellees, v. Pat Quinn, Governor, State of Illinois, *et al.*, Appellants). |
| Docket No. | 118585 |
| Filed | May 8, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, the Hon. John W. Belz, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Richard S. Huszagh, Gary S. Caplan and Clifford W. Berlow, Assistant Attorneys General, of Chicago, of counsel), for appellants. |
| | Aaron B. Maduff, Walker R. Lawrence and John D. Carr, of Maduff Maduff, LLC, Gino L. DiVito, John M. Fitzgerald, Brian C. Haussmann and Uri B. Abt, of Tabet DiVito & Rothstein LLC, and Michael D. Freeborn, John T. Shapiro, John E. Stevens and Dylan Smith, of Freeborn & Peters LLP, of Chicago, Michael T. Reagan, of Ottawa, and Donald M. Craven, of Springfield, for appellees. |

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1        At issue on this appeal is the constitutionality of Public Act 98-599 (eff. June 1, 2014), which amends the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2012)) by reducing retirement annuity benefits for individuals who first became members of four of Illinois' five State-funded pension systems prior to January 1, 2011. Members of the retirement systems affected by Public Act 98-599 and groups representing those members brought five separate actions challenging the validity of the new law on the grounds that it violated numerous provisions of the Illinois Constitution of 1970, including article XIII, section 5 (Ill. Const. 1970, art. XIII, § 5), popularly known as the pension protection clause.

¶ 2        All five actions were consolidated in the circuit court of Sangamon County. On motions for partial summary judgment, judgment on the pleadings, and to strike an affirmative defense, the circuit court found plaintiffs' challenge to be meritorious, declared Public Act 98-599 to be unconstitutional in its entirety as a violation of the pension protection clause, and permanently enjoined its enforcement. In so doing, the circuit court rejected defendants' contention that the Act could be upheld, notwithstanding its violation of the pension protection clause, based on the State's reserved sovereign powers. Because the circuit court's judgment invalidated a statute of the State of Illinois, appeal lay directly to this court. Ill. S. Ct. R. 302(a)(1) (eff. Oct. 4, 2011). At the request of the State, we expedited briefing and argument.[1] For the reasons that follow, we affirm.

¶ 3                                **BACKGROUND**

¶ 4        Illinois has established five State-funded retirement systems for public employees: the General Assembly Retirement System (GRS) (40 ILCS 5/2-101 *et seq.* (West 2012)); the State Employees' Retirement System of Illinois (SERS) (40 ILCS 5/14-101 *et seq.* (West 2012)); the State Universities Retirement System (SURS) (40 ILCS 5/15-101 *et seq.* (West 2012)); the

---

[1]In retrospect, the State's "Motion for Accelerated Docket" is perplexing. The State requested expedited briefing and argument on the grounds that a prompt decision by this court was necessary to assist the legislature and the Governor in formulating a budget for the next fiscal year. Because implementation of the law has already been enjoined, a decision by this court could alter the budgetary landscape for the upcoming fiscal year only if we allowed some or all of the law to take effect immediately. When the State ultimately filed its brief, however, that is not the relief it sought. Rather, its principal request was that we remand to the circuit court for further proceedings, including an evidentiary hearing, with respect to its claim that the legislation challenged here is a proper exercise of the State's police powers. Even if the State had prevailed, there is no reasonable possibility that such proceedings, and the appeals which would inevitably follow, could be completed prior to the May 31, 2015, deadline for passage of the new State budget.

Teachers' Retirement System of the State of Illinois (TRS) (40 ILCS 5/16-101 *et seq.* (West 2012)); and the Judges Retirement System of Illinois (JRS) (40 ILCS 5/18-101 *et seq.* (West 2012)). These systems provide traditional defined benefit plans under which members earn specific benefits based on their years of service, income and age. All are subject to the pension protection clause of our state constitution, which provides: "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5.

¶ 5    Among the benefits which members of the five State-funded retirement systems are entitled to receive are retirement annuities. *Kanerva v. Weems*, 2014 IL 115811, ¶ 3. The amount of a member's retirement annuity and how soon a member is eligible to begin receiving annuity payments depends on when the member first began making contributions into one of the retirement systems. Members who first contributed prior to January 1, 2011, receive what are known as "Tier 1" annuity benefits. Members first contributing on or after January 1, 2011, receive a lower level of benefits designated as "Tier 2." See Pub. Act 96-889 (eff. Apr. 14, 2010). Public Act 98-599, the legislation challenged in this case, is directed primarily at Tier 1 annuities and is limited in its application to benefits earned under the GRS, SERS, SURS and TRS systems. Annuities paid to judges under the JRS system were intentionally excluded from the law and are not affected by it.

¶ 6    Tier 1 retirement annuity benefits and eligibility requirements differ somewhat between the various systems. Because they all operate in approximately the same way, however, we will choose just one, SERS, to illustrate their basic features.

¶ 7    Members of SERS are eligible to retire at age 60 if they have at least eight years of credited service. They may retire with full benefits at any age if their age plus years of service credit equal 85. They are also eligible to retire if they are between the ages of 55 and 60 and have at least 25 years of credited service, but their benefit will be reduced by half of 1% for each month they are under the age of 60. 40 ILCS 5/14-107, 14-108 (West 2012).

¶ 8    The amount of the retirement annuity benefit under SERS is calculated based on (1) the member's final average compensation, which is the average monthly compensation they received during their highest-paid 48 consecutive months of service over the previous ten years, (2) their total credited service, and (3) a multiplier, which changes depending on (a) whether or not the member is also covered by Social Security or (b) qualifies for an "alternative retirement annuity" (applicable to, *e.g.*, pilots and state policemen). 40 ILCS 5/14-107, 14-108, 4-110 (West 2012). For members who do have Social Security and are not subject to the alternative retirement annuity rules, the multiplier is 1.67% per year of credited service. 40 ILCS 5/14-108(b) (West 2012). Accordingly, a member of SERS who is eligible to retire, who has also paid into Social Security, and who has final average compensation of $1,800 per month and 30 years of credited service will receive a retirement annuity of $901.80 per month (30 x .0167 x $1,800).

¶ 9    SERS members may earn a retirement annuity of up to 75% of their final average compensation (40 ILCS 5/14-108(d) (West 2012)), although for members covered by Social Security, it would take nearly 45 years of State service to do so. These annuity payments are subject to 3% automatic annual increases beginning after the member's first full year of retirement, except that some members who retire before 60 and do not meet the rule of 85 will

- 3 -

not receive the increases until they turn 60 and have been retired at least one full year. 40 ILCS 5/14-114(a) (West 2012). The annual annuity adjustments are built-in to the pension benefit and are not tied to the cost of living. As a result, the real value of annuities may either increase or erode depending on economic conditions, notwithstanding the adjustments.[2]

¶ 10    Funding to pay benefits under each of Illinois' five State-funded systems is derived from three basic sources: contributions by the State through appropriation by the General Assembly; contributions by or on behalf of members based on their salaries; and income, interest and dividends derived from retirement fund deposits and investments. 40 ILCS 5/2-124 to 2-126, 14-131 to 14-133.1, 15-155 to 15-157.1, 16-152, 16-154, 16-158, 18-131 to 18-133.1 (West 2012). The contributions to the systems by or on behalf of members of the systems have not been problematic. There is no dispute that employees have paid their full share as required by law at all times relevant to this litigation. That has not been the case with respect to the contributions owed by the General Assembly.

¶ 11    For as long as there have been public pension systems in Illinois, there has been tension between the government's responsibility for funding those systems, on the one hand, and the costs of supporting governmental programs and providing governmental services, on the other. In the resulting political give and take, public pensions have chronically suffered. As long ago as 1917, a report commissioned by the General Assembly characterized the condition of State and municipal pension systems as "one of insolvency" and "moving toward a crisis" because of financial provisions which were "entirely inadequate for paying the stipulated pensions when due." Report of the Illinois Pension Laws Commission 272 (1917). Similar warnings were issued by the Illinois Public Employees Pension Laws Commission in biennial reports it published between 1947 and 1969. See, *e.g.*, Report of the Illinois Public Employees Pension Laws Commission of 1949, 10 (1949) (revenues allocated to pension funds have not kept pace with obligations and, with few exceptions, "every fund in Illinois suffers at this time an actuarial insolvency").

¶ 12    As the deficient contributions continued even during the post-WWII boom, the Commission wondered: "[i]f the State of Illinois and local governments are today resisting the full or substantial funding of pension obligations under present conditions of economic prosperity, how much more unfavorable will be the financial status of the funds when the obligations mature in greater proportions and economic conditions may not be as promising?" Report of the Illinois Public Employees Pension Laws Commission of 1957, 10 (1957). Still, nothing changed. More than a decade later, as the citizens of our State were about to take up the question of whether a new constitution should be adopted, the Illinois Public Employee Pension Laws Commission continued to sound the same alarm, noting that with respect to State-financed pension funds, appropriations "had been below mandatory statutory requirements as expressly provided in the governing law" and were "grossly insufficient." Report of the Illinois Pension Laws Commission of 1969, 106 (1969). At the time the Commission made those statements, the GRS, SERS, SURS, TRS and JRS systems had an overall funding rate of approximately 41.8%. *Id.* at 32, Table 2.

---

[2]By way of comparison, data published by the Social Security Administration show that Social Security increases, which are tied to the cost of living, averaged 3.98%, nearly a percentage point more than under the Illinois formula, between 1975 and 2014. http://www.ssa.gov/OACT/COLA/colaseries.html.

- 4 -

¶ 13    Concern over ongoing funding deficiencies and the attendant threat to the security of retirees in public pension systems eventually led directly to adoption of article XIII, section 5, the pension protection clause, when the new constitution was adopted in 1970. Delegate Green, one of the provision's sponsors, introduced it to the Constitutional Convention by reminding his fellow delegates of the poor job governmental entities had done in meeting their pension obligations over time. He pointed out that:

"[i]n the past twenty-two years the unfunded accrued liabilities of these pension plans in Illinois have increased from about $359,000,000 to almost $2,500,000,000, and the unfunded accrued liabilities are real and are not theoretical obligations based upon service already rendered.

Despite the consistent warnings from the Pension Laws Commission, the current budgeting of pension costs necessary to ensure the financial stability of these funds, the General Assembly has failed to meet its commitments to finance the pension obligations on a sound basis. In 1967 the General Assembly approved Senate Bill 515 which provided for the appropriation to one state university retirement system, to at least equal to an amount which would be necessary to fund fully the current service costs and to cover the interest on the past service; and despite this legislative mandate, the General Assembly refused to appropriate the necessary funds. Now, during this two-year period alone the appropriations under this system were $67,000,000 less than the minimum required by the senate bill.

Now, what we are proposing is being carried out in some other states ***. Our language is that language that is in the New York Constitution which was adopted in 1938, really under a similar circumstance. In 1938 you were about at the end of the Depression, but there was a great consideration on the part of the New York General Assembly to really cut out some of the money that they were giving to the pension programs in New York; and it was for this reason that the New York Constitution adopted the language that we are suggesting. Since that time, the state of New York—the pension funds for public employees have been fully funded, and so I think we have good reason to believe that this type of language will be a mandate to the General Assembly to do something which they have not previously done in some twenty-two years." 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2925 (statements of Delegate Green) (hereinafter Record of Proceedings).

¶ 14    Delegate Green's remarks were followed by statements from Delegate Kinney, who noted in further support of the provision that the proposed creation of broad home rule powers for municipalities had led to concerns that, unless they were constrained, municipalities who preferred to use retirement money for other public purposes such as street repair might abandon their pension obligations, leaving police officers, firefighters and other civil servants unprotected. *Id.* at 2926 (statements of Delegate Kinney). Delegate Bottino, in turn, observed that:

"participants in these pension systems have been leery for years of the fact that the—this matter of the amount the state has appropriated [for pensions] has been made a political football, in a sense. In other words, in order to balance budgets, you see, the party in power would just use the amount of the state contribution to help balance budgets, and this had gotten to the point where many of the socalled pensioners under

this system were very concerned; and I think this is the reason that pressure is constantly being placed on the legislature to at least put a fair amount of state resources into guaranteeing payment of pensions." *Id.* at 2930-31 (statements of Delegate Bottino).

¶ 15    The solution proposed by the drafters and ultimately approved by the people of Illinois was to protect the benefits of membership in public pension systems not by dictating specific funding levels, but by safeguarding the benefits themselves. As we discussed in *Kanerva v. Weems*, 2014 IL 115811, ¶¶ 46-47, Delegate Green explained that the pension protection clause does this in two ways: "[i]t first mandates a contractual relationship between the employer and the employee; and secondly, it mandates the General Assembly not to impair or diminish these rights." 4 Record of Proceedings 2925 (statements of Delegate Green). Subsequent comments by other delegates reaffirmed that the provision was designed to confer contractual protection on the benefits of membership in public retirement systems and afford beneficiaries, pensioners or their dependents " 'a basic protection against abolishing their rights completely or changing the terms of their rights after they have embarked upon the employment—to lessen them.' " *Kanerva v. Weems*, 2014 IL 115811, ¶ 46 (quoting 4 Record of Proceedings 2929 (statements of Delegate Kinney)).

¶ 16    The purpose of the clause and its dual features have never been in dispute. As we noted in *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220, 228-29 (1998), the clause "served to eliminate any uncertainty as to whether state and local governments were obligated to pay pension benefits to the employees," and its "plain language" not only "makes participation in a public pension plan an enforceable contractual relationship," but also "demands that the 'benefits' of that relationship 'shall not be diminished or impaired.' " The "politically sensitive area" of how the benefits would be financed was a matter left to the other branches of government to work out. *Id.* at 233.[3] That article XIII, section 5, created an enforceable obligation on the State to pay the benefits and prohibited the benefits from subsequently being reduced was and is unquestioned.

¶ 17    Despite Delegate Green's hope that prohibiting the State from diminishing retirement benefits would induce the General Assembly to meet its funding obligations, as the legislature in New York State had done when the same pension protection provision was adopted there, that did not occur. Until 1982, the State funded its pensions using an approach which the United States Securities and Exchange Commission (SEC) has characterized as bearing "no relation to actuarial calculation." *In re State of Illinois*, SEC Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing Cease-and-Desist Order, Securities Act of 1933, Release No. 9389, at 3, 2013 WL 873208 (Mar. 11, 2013) (hereinafter, SEC order).[4]

¶ 18    In 1989, the General Assembly enacted a new funding plan to take effect in 1990, but it failed as well. In the years that followed, Dawn Clark Netsch, then comptroller of the State,

---

[3]Consistent with an earlier opinion by this court in *McNamee v. State*, 173 Ill. 2d 433 (1996), and comments at the Constitutional Convention, we did not, however, foreclose the possibility that a direct action could be brought by pension system members to compel funding if a pension fund were on the verge of default or imminent bankruptcy. *Sklodowski*, 182 Ill. 2d at 232-33.

[4]The SEC order is a matter of which we may take judicial notice. See *May Department Stores Co. v. Teamsters Union Local No. 743*, 64 Ill. 2d 153, 159 (1976).

- 6 -

noted that the State failed to adhere to the new statutory funding levels and exacerbated the problem by diverting funds earmarked for State employee pensions into the General Revenue Fund. In testimony before the United States Congress, which was investigating the use of public pension funds, she stated:

> " 'My concern is for the future health of our state retirement systems and for the deferral of obligations to future generations. Underappropriated pension contributions are like unpaid credit card bills. The liability does not go away just because you choose not to pay the bill when it is due. You still owe the unpaid balance, plus interest.[']
>
> 'Eventually, the cost of rectifying the problem becomes too great. Our problems might be more understandable if our retirement systems provided extravagant benefits, but they do not. We are having trouble facing our obligations for systems that have some of the lowest benefit levels in the country.' " Dawn Clark Netsch, *State Pension Raids Rampant in the 1990s*, Ill. Mun. Rev. 15, 15 (Feb. 1993).

¶ 19    Starting in 1995, yet another funding plan was implemented by the General Assembly. This one called for the legislature to contribute sufficient funds each year to ensure that its contributions, along with the contributions by or on behalf of members and other income, would meet the cost of maintaining and administering the respective retirement systems on a 90% funded basis in accordance with actuarial recommendations by the end of the 2045 fiscal year. 40 ILCS 5/2-124, 14-131, 15-155, 16-158, 18-131 (West 2012). That plan, however, contained inherent shortcomings which were aggravated by a phased-in "ramp period" and decisions by the legislature to lower its contributions in 2006 and 2007. As a result, the plan failed to control the State's growing pension burden. To the contrary, the SEC recently pointed out:

> "the Statutory Funding Plan's contribution schedule increased the unfunded liability, underfunded the State's pension obligations, and deferred pension funding. The resulting underfunding of the pension systems ('Structural Underfunding') enabled the State to shift the burden associated with its pension costs to the future and, as a result, created significant financial stress and risks for the State." SEC order, at 3.

¶ 20    That the funding plan would operate in this way did not catch the State off guard. In entering a cease-and-desist order against the State in connection with misrepresentations made by the State with respect to bonds sold to help cover pension expenses, the SEC noted that the State understood the adverse implications of its strategy for the State-funded pension systems and for the financial health of the State. *Id.* at 10. According to the SEC, the amount of the increase in the State's unfunded liability over the period between 1996 and 2010 was $57 billion. *Id.* at 4.[5] The SEC order found that "*[t]he State's insufficient contributions under the Statutory Funding Plan were the primary driver of this increase, outweighing other causal factors, such as market performance and changes in benefits*." (Emphasis added.) *Id.* at 4.

¶ 21    By the end of June, 2013, the five State-funded retirement systems contained a total of only 41.1% of the funding necessary to meet their accrued liabilities based on the market value of fund assets. Commission of Government Forecasting & Accountability, Illinois State

---

[5]It appears from the record before us that the total unfunded liabilities for the five State-funded retirement systems approached $100 billion by the time this litigation commenced. While the State has pursued this appeal, it has no doubt grown larger.

Retirement Systems: Financial Condition as of June 30, 2013, 27 (Mar. 2014). The funding rate was thus nearly unchanged from the 41.8% funding rate prior to ratification of the 1970 Constitution and its pension protection clause. By contrast, as of December 30, 2013, the Illinois Municipal Retirement Fund (IMRF), another major public pension plan which operates in the same market environment as the five State-funded systems, but which is managed separately and not funded by the State, had an aggregate funding rate of 96.7% based on the market value of its assets. Illinois Municipal Retirement Fund, Comprehensive Annual Financial Report for the Years Ended December 31, 2013 and December 31, 2012, 8 (May 30, 2014).[6]

¶ 22    As the continued deficiencies in the legislature's pension funding efforts became apparent to financial markets, federal regulators and the public, the State was also experiencing significant difficulties in meeting its other obligations. To address these budgetary pressures, the State implemented a variety of measures, including delaying payments to creditors and vendors who do business with the State, reducing or eliminating a variety of governmental programs, enacting a temporary income tax increase (which was recently allowed to expire), and significantly lowering benefits for anyone first contributing to State pension systems after January 1, 2011 (the so-called Tier 2 plan for new hires, *supra* ¶ 5).[7]

¶ 23    Following downgrades in the State's credit rating and facing the prospect that its credit rating would be reduced even further, the General Assembly engaged in heated and protracted debate over possible legislative strategies for dealing with the State's fiscal problems through further changes to its pension obligations. After numerous failed attempts to reach consensus, the General Assembly ultimately enacted what became Public Act 98-599, the legislation challenged in this case.

¶ 24    Introduced as Senate Bill 1 and passed during the legislature's fall, 2013, "veto session," Public Act 98-599 was described as an attempt to address the State's large debts and deficits, plummeting credit ratings, and imperiled discretionary spending programs "that are essential to the people of Illinois" and to help shore up the long-term fiscal stability of both the State and its retirement systems. Pub. Act 98-599, § 1 (eff. June 1, 2014). The mechanism chosen under the Act to accomplish those purposes was restructuring State-funded retirement systems. The

---

[6]Several neighboring states also managed to achieve far higher funding rates than Illinois' State-funded systems during a similar time frame. The "fair value" based funding ratio for the Wisconsin Retirement System was 105.3%. Wisconsin Dept. of Employee Trust Funds, Comprehensive Annual Financial Report for the Year Ended Dec. 31, 2013, 3 (Dec. 15, 2014). In Iowa, the funded ratio was 82.7% as of June 30, 2013. Iowa Public Employees' Retirement System, An Annual Summary for the Fiscal Year Ended June 30, 2014, 7 (2014). The Indiana Public Retirement System, which administers eight separate "pre-funded" plans, reported an aggregate funded percentage of 87.9%. Indiana Public Retirement System, 2014 Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2014, 11 (Dec. 17, 2014). The funded ratio for Missouri's various plans averaged 73.3%. Missouri State Employees' Retirement System, Summary Annual Financial Report Fiscal Year Ended June 30, 2014, 6 (Oct. 17, 2014).

[7]It also attempted to reduce the health care premium subsidies it was required to pay for annuitants, survivors and retired employees under the SERS, SURS and TRS systems. The legislation authorizing that reduction was declared unconstitutional by this court in *Kanerva v. Weems*, 2014 IL 115811, for the same reason Public Act 98-599 is being challenged here, namely, that it violated the pension protection clause.

law does not pertain to all five of the State-funded retirement systems, however. As noted earlier, JRS, the Judges Retirement System, was deliberately excluded.[8]

¶ 25　　Public Act 98-599 contains numerous provisions. Among these are a new payment schedule to replace the one in effect since 1995 (40 ILCS 5/2-124, 14-131, 15-155, 16-158 (West Supp. 2013)); a mechanism authorizing pension boards to initiate *mandamus* proceedings in our court if the State fails to make required contributions to their respective systems (40 ILCS 5/2-125, 14-132, 15-156, 16-158.2 (West Supp. 2013)); and special directives with respect to certain payments to the pension systems, when the payments are to be made and in what amounts (30 ILCS 122/20, 25 (West Supp. 2013); 40 ILCS 5/2-125, 14-132, 15-156, 16-158.2 (West Supp. 2013)).

¶ 26　　The Act provides a limited number of Tier 1 plan participants with the opportunity, at a future date, to participate in a defined contribution plan. 40 ILCS 5/2-165, 14-155, 15-200, 16-205 (West Supp. 2013). It affords a nominal reduction in the percentage of their salaries Tier 1 plan participants are required to contribute toward the employee share of annuity costs. 40 ILCS 5/2-126, 14-133, 15-157, 16-152 (West Supp. 2013). Going forward, it bars persons hired by certain nongovernmental organizations from participating in the public pension system (40 ILCS 5/7-109, 15-106, 16-106 (West Supp. 2013)) and prohibits new hires from using accumulated sick or vacation time to boost their pension benefits (40 ILCS 5/7-116, 7-139, 9-219, 9-220, 14-104.3, 14-106, 15-112, 15-113.4, 16-121, 16-127, 17-134 (West Supp. 2013)). Public Act 98-599 also eliminates the duty of employers to engage in collective bargaining or interest arbitration "over matters affected by the changes, the impact of changes, and the implementation of changes" made to the SERS, SURS and TRS systems by the new law. 5 ILCS 315/7.5 (West Supp. 2013).

¶ 27　　The centerpiece of Public Act 98-599, however, is a comprehensive set of provisions designed to reduce annuity benefits for members of GRS, SERS, SURS and TRS entitled to Tier 1 benefits, *i.e.*, members who belonged to those systems prior to January 1, 2011. The new law utilizes five different mechanisms for achieving this goal. First, it delays, by up to five years, when members under the age of 46 are eligible to begin receiving their retirement annuities. 40 ILCS 5/2-119(a-1), 14-107(c), 14-110(a-5), 15-135(a-3), 16-132(b) (West Supp. 2013). Second, with certain exceptions and qualifications, it caps the maximum salary that may be considered when calculating the amount of a member's retirement annuity. 40 ILCS 5/2-108, 2-108.1, 14-103.10(h), 15-111(c), 16-121 (West Supp. 2013). Third, it jettisons the current provisions under which retirees receive flat 3% annual increases to their annuities and replaces them with a system under which annual annuity increases are determined according to a variable formula and are limited. 40 ILCS 5/2-119.1(a-1), 14-114(a-1), 14-115(d), 15-136(d-1), 16-133.1(a-1), 16-136.1(b-1) (West Supp. 2013). Fourth, it completely eliminates at least one and up to five annual annuity increases depending on the age of the pension system member at the time of the Act's effective date. 40 ILCS 5/2-119.1(a-2), 14-114(a-2), 15-136(d-2), 16-133.1(a-2), 16-136.1(b-2) (West Supp. 2013). Finally, with respect to the TRS and SURS systems, the Act also alters how the base annuity amount is

---

[8]The decision to exclude the JRS was unrelated to the economic health of that system, whose funding percentage, 29.8%, is second worst among the five State-funded systems. Commission on Government Forecasting and Accountability, Illinois State Retirement Systems: Financial Condition as of June 30, 2013, 27 (Mar. 2014).

determined for purposes of what is known as the "money purchase" formula, something available to members of those two systems who began employment prior to July 1, 2005, as an alternative to the standard formula for calculating pensions. See 40 ILCS 5/15-136, 16-133 (West Supp. 2013). Because of this change, which involves use of a different interest rate, affected members of TRS and SURS will have smaller base pensions.

¶ 28    Senate Bill 1, which became Public Act 98-599, was explained to the Senate through presentation of a conference committee report by one of the bill's chief sponsors, Senator Kwame Raoul. Senator Raoul described the various provisions of the bill as "all part of an integral bipartisan package" designed to reduce unfunded liabilities in the pension systems which had resulted, principally, from "the State not contributing what it should have" to those systems. 98th Ill. Gen. Assem., Senate Proceedings, Dec. 3, 2013, at 4 (statements of Senator Raoul). He noted prior government reports which had found that "the reality is that the primary cause of the State['s unfunded] liability is Illinois' decades-long failure to make its full actuarial required employer contributions to the five pension systems." *Id.* at 5. He advised his colleagues that the bill would reduce the unfunded pension liability by $21.4 billion, and then summarized the specific provisions of the law that would make that possible, including the critical benefit reductions described above. *Id.* at 5-7.

¶ 29    During discussion of the bill, Senator Hutchinson asked: "Am I correct that the legislation intends to and will have a direct and substantial impact on the benefits of current employees and retirees by reducing their benefits?" *Id*. at 40 (statements of Senator Hutchinson). Senator Raoul responded: "Yes. You are correct." *Id.* (statements of Senator Raoul).

¶ 30    This colloquy followed:

"SENATOR HUTCHINSON:

I know that one of the objectives of this legislation is really to improve the State's credit rating. Is that correct? I mean, that's why we're here.
    ***

SENATOR RAOUL:

It—it's one of—one of—one of the State's fiscal issues, yes, and one—one of the objectives.
    ***

SENATOR HUTCHINSON:

So, then, is it fair to say that we are sacrificing a substantial amount of people's pension benefits to protect the State's finances?
    ***

SENATOR RAOUL:

Yeah, I—you know, that's a harsh characterization, but—but I—I suppose yes.
    * * *

SENATOR HUTCHINSON:

The bill's legislative statement states in the fourth paragraph that this 'is intended to address fiscal issues facing the State and its retirement systems in a manner that's

feasible'. So, by using the word 'feasible', does that mean that there are other feasible alternatives to this bill?

\*\*\*

SENATOR RAOUL:

Certainly there are. I mean, certainly, you know, as has been mentioned, a lot of these levers are—are levers that can be tweaked one way or the other, and there are other proposals that were entertained by the conference committee. But—but, you know, we're trying to move from a stalemate. So, yes, there are other alternatives, but, you know, this is an effort to move from a—from a stalemate.

\* \* \*

SENATOR HUTCHINSON:

Would another alternative be the proposal that the Center for Tax and Budget Accountability outlined before the conference committee, which would have re-amortized the current unfunded liabilities to a new gradual [level] dollar payment schedule to achieve well over eighty percent by 2059?

\*\*\*

SENATOR RAOUL:

Yes. \*\*\* So that—that and many other things could have been possible alternatives.

\* \* \*

SENATOR HUTCHINSON:

[The last sentence of the fourth paragraph of the report contains the phrase] that the legislation is 'minimizing the impact on current and retired State employees'. So by using 'minimizing', does that mean that the legislation is somehow the least restrictive means available to us?

\*\*\*

SENATOR RAOUL:

Yeah, I—you know,—I don't know what the least restrictive means are. I—I think what we're doing just reflects what the political climate is. Again, I've—I've—I've said, time and again, that we've been cemented in a stalemate, and I, for my part, don't want to see the State sink as a result of that stalemate. So, it may not be the least restrictive means, but the political climate, I believe, allows for us to—to—to take the step that we're—we're hopefully now taking." *Id*. at 41-46 (statements of Senators Hutchinson and Raoul).

¶ 31 Following this exchange and remarks by Senator Hutchinson, the Senate's presiding officer recognized one final speaker, Senator Christine Radogno, another of the bill's sponsors. In urging passage of the legislation, Senator Radogno characterized it as "the one opportunity that we have to finally, finally address the most important economic issues that are facing this State, and that includes our credit ratings, our financial position, our jobs climate, and, frankly, our reputation in the global economy." *Id.* at 48 (statements of Senator Radogno).

¶ 32 After being approved by both houses of the General Assembly, Senate Bill 1 was signed into law by then-Governor Quinn as Public Act 98-599 on December 5, 2013. Five separate lawsuits challenging the law were filed almost immediately. These are Retired State

Employees Ass'n Retirees v. Quinn, No. 2014 MR 1 (Cir. Ct. Sangamon Co.) (hereinafter *RSEA*), Illinois State Employees Ass'n v. Board of Trustees of State Employees Retirement System, No. 2014 CH 3 (Cir. Ct. Sangamon Co.) (hereinafter *ISEA*), and Harrison v. Quinn, No. 2014 CH 48 (Cir. Ct. Sangamon Co.) (hereinafter *Harrison*), all of which were filed in Sangamon County; State Universities Annuitants Ass'n v. State Universities Retirement System, No. 2014 MR 207 (Cir. Ct. Champaign Co.) (hereinafter *SUAA*), originally filed in Champaign County; and Heaton v. Quinn, No. 13 CH 28406 (Cir. Ct. Cook Co.) (hereinafter *Heaton*), originally filed in Cook County. In March of 2014, this court entered an order pursuant to Supreme Court Rule 384 (Ill. S. Ct. R. 384) transferring *Heaton* to Sangamon County and consolidating it with *RSEA*, *ISEA* and *Harrison.* We subsequently entered a similar order with respect to *SUAA*.

¶ 33   Plaintiffs in these five consolidated cases are individual members of the four retirement systems affected by Public Act 98-599, both current employees and retirees, as well as organizations representing such members and their interests under Illinois pension law.[9] Defendants include the Governor, Treasurer and Boards of Trustees of GRS, SERS, SURS and TRS. Judy Baar Topinka was also made a nominal defendant in her capacity as Comptroller. The Attorney General has noted in the record, however, that prior to her death in office, Comptroller Topinka disavowed the Attorney General's arguments in support of Public Act 98-599.

¶ 34   The complaints in all five consolidated actions focused their challenges on the core provisions of Public Act 98-599 we have just described, namely, those which would reduce the retirement annuities of individuals entitled to Tier 1 benefits by raising the age at which members under the age of 46 are eligible to begin receiving their retirement annuities, capping the maximum salary that may be considered when calculating the amount of a member's retirement annuity, abolishing the existing fixed 3% annual annuity increases, eliminating at least one and up to five annual annuity increases under the new formula, and altering how the base annuity amount is determined for purposes of the "money purchase" formula.

¶ 35   Plaintiffs' challenges to the new law were predicated on the Illinois Constitution of 1970. In all five actions, plaintiffs' principal contention was that the reduction in retirement annuity benefits for Tier 1 employees was void and unenforceable as a violation of the constitution's pension protection clause (Ill. Const. 1970, art. XIII, § 5). Four of the complaints (*RSEA*, *ISEA*, *Harrison*, and *SUAA*) also alleged that the annuity reduction provisions violated article I, section 16, of the Illinois Constitution (Ill. Const. 1970, art. I, § 16), which provides, *inter alia*, that no law impairing the obligation of contracts shall be passed. Two of those four complaints (*RSEA* and *ISEA*) included separate impairment of contract claims on behalf of a specific subset of employees who elected to participate in early retirement programs offered by the State in 1991, 2002 and 2005. Violations of article I, section 15, of the Illinois Constitution (Ill. Const. 1970, art. I, § 15), which prohibits the taking or damaging of private property for public use without just compensation, were alleged in *Harrison* and *SUAA*. In addition, *RSEA* and *ISEA* asserted that the annuity reductions violated equal protection under article I, section 2, of

---

[9]Although the plaintiffs in *RSEA*, *ISEA*, *Harrison* and *Heaton* initially sought class certification, they ultimately withdrew their class action allegations, and no questions regarding class certification are at issue.

the Illinois Constitution (Ill. Const. 1970, art. I, § 2) because they did not also include members of the JRS system, *i.e.*, judges.[10]

¶ 36    By its terms, Public Act 98-599 was scheduled to take effect June 1, 2014. On plaintiffs' motion, the circuit court entered a preliminary injunction on May 14, 2014, staying implementation of the law and enjoining defendants from enforcing or administering any of its provisions pending further order of the court. That injunction remained in effect throughout the circuit court proceedings.

¶ 37    The State answered plaintiffs' complaints and raised as an affirmative defense that because of "unanticipated exigencies contributing to the Systems' unsound financial condition and the State's related fiscal crisis" and "[i]n light of the measures already taken by the General Assembly to address the Systems' financial condition and the State's fiscal crisis, and in light of the serious negative effects" other alternatives would entail, the reduction in Tier 1 retirement annuities by the General Assembly was justified as an exercise of the State's "reserved sovereign power," *i.e.*, its "police power." More specifically, the State argued that plaintiffs' claims under the Illinois Constitution should be rejected as a matter of law because (1) through the State's police power, the General Assembly possesses inherent authority to override and modify obligations imposed on it by the Illinois Constitution when, in its judgment, such action is reasonable and necessary to advance an important public purpose; (2) because of the "dramatic squeeze on the State's finances" caused by the Great Recession, the strain on the State's revenues which would result from having to meet current pension obligations, the poor condition of the State's economy, and the continued deterioration of the State's credit rating, notwithstanding the State's attempts to employ other remedial measures, action was needed in the interest of the public good; and (3) the reduction in retirement annuity benefits which would result from implementation of Public Act 98-599 to these fiscal challenges is fair and reasonable under the circumstances.

¶ 38    Plaintiffs in *SUAA* moved to strike the State's "reserved sovereign power" affirmative defense pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)). A similar, but separate motion was filed by the plaintiffs in the other four cases. The plaintiffs in *RSEA* and *ISEA* moved for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2012)) with respect to the claim that Public Act 98-599 violated equal protection under the Illinois Constitution. All plaintiffs filed a joint motion for partial summary judgment addressed to their claims that the Act was void and unenforceable under the pension protection clause. The State, in turn, filed its own motion for summary judgment, arguing that its reserved sovereign powers defense was fatal to all of plaintiffs' claims.

¶ 39    Following a hearing, the circuit court granted the plaintiffs' joint motion for partial summary judgment on their claims that Public Act 98-599 was void and unenforceable under the pension protection clause, allowed the various motions by plaintiffs for judgment on the pleadings as to the State's affirmative defense or to strike that defense and denied the motion for summary judgment filed by the State. The court specifically found that, on its face, the Act would diminish the benefits of membership in the four affected State-funded retirement systems by reducing retirement annuities in each of the five ways alleged by plaintiffs. The

---

[10]There were other variations between the cases, but they are not germane to our resolution of this appeal and require no further discussion.

court further concluded, based on existing case law, that the pension protection clause contains nothing to support the contention that the legislature possessed implied or reserved power to diminish or impair pensions. "[T]he State of Illinois made a constitutionally protected promise to its employees concerning their pension benefits," the court ruled. "Under established and uncontroverted Illinois law, the State of Illinois cannot break that promise."

¶ 40    Because it believed that the constitutionally infirm annuity reduction provisions were an important part of the overall legislative package, the court declared the Act to be unconstitutional in its entirety and permanently enjoined its enforcement. In light of that result, the court concluded that there was no need to address the other issues raised in the case, including plaintiffs' challenges based on other provisions of the Illinois Constitution.

¶ 41    The circuit court subsequently made the express written findings required by Illinois Supreme Court Rule 18 (Ill. S. Ct. R. 18 (eff. Sept. 1, 2006)) where, as here, a statute is declared unconstitutional. The State appealed. Because the circuit court's judgment invalidated a statute of the State of Illinois, the appeal was taken directly to this court. Ill. S. Ct. R. 302(a) (eff. Oct. 4, 2011).

¶ 42                                                    ANALYSIS

¶ 43    Three issues are presented for our review: (1) does Public Act 98-599's reduction of retirement annuity benefits owed to members of the GRS, SERS, SURS and TRS retirement systems violate the pension protection clause set forth in article XIII, section 5, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5); (2) if so, can the law's reduction of those benefits nevertheless be upheld as a proper exercise of the State's police power; and (3) if not, are the invalid provisions of Public Act 98-599 severable from the remainder of the statute? These are all questions of law.[11] Our review is therefore *de novo*. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33.

¶ 44                                                        I

¶ 45    The first issue, whether Public Act 98-599's reduction of retirement annuity benefits violates this State's pension protection clause, is easily resolved. The pension protection clause clearly states: "[m]embership in any pension or retirement system of the State *** shall be an enforceable contractual relationship, *the benefits of which shall not be diminished or impaired*." (Emphasis added.) Ill. Const. 1970, art. XIII, § 5. This clause has been construed by our court on numerous occasions, most recently in *Kanerva v. Weems*, 2014 IL 115811. We held in that case that the clause means precisely what it says: "if something qualifies as a benefit of the enforceable contractual relationship resulting from membership in one of the State's pension or retirement systems, it cannot be diminished or impaired." *Id.* ¶ 38.

¶ 46    This construction of article XIII, section 5, was not a break from prior law. To the contrary, it was a reaffirmation of principles articulated by this court and the appellate court on numerous occasions since the 1970 Constitution took effect. Under article XIII, section 5,

_____

[11]Severability presents a legal question because assessing whether invalid provisions of a statute are severable from the remainder is a matter of statutory construction (*People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 534 (1990)) and statutory construction is a question of law (*Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 439 (2010)).

members of pension plans subject to its provisions have a legally enforceable right to receive the benefits they have been promised. *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220, 229-32 (1998); *McNamee v. State*, 173 Ill. 2d 433, 444-46 (1996). The protections afforded to such benefits by article XIII, section 5 attach once an individual first embarks upon employment in a position covered by a public retirement system, not when the employee ultimately retires. See *Di Falco v. Board of Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One*, 122 Ill. 2d 22, 26 (1988). Accordingly, once an individual begins work and becomes a member of a public retirement system, any subsequent changes to the Pension Code that would diminish the benefits conferred by membership in the retirement system cannot be applied to that individual. *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99, 105-06 (1987) (pension protection clause barred statutory change in Pension Code which prevented current pension system member from purchasing service credit for time spent in military); *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158, 162-63 (1985) (amendment to Pension Code adversely affecting base salary used to compute annuity impermissibly reduced retirement benefits of existing retirement system members in violation of pension protection clause); *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d 833, 844-48 (1979) (change in Pension Code's method of computing a police officer's pensionable salary in a way that would reduce the amount of the pension could not, under the pension protection clause, be applied to persons who were members of the retirement system prior to the amendment's effective date); *Miller v. Retirement Board of Policemen's Annuity & Benefit Fund*, 329 Ill. App. 3d 589 (2001) (amendments to Pension Code which reduced benefits of existing retirement system members with respect to eligibility for automatic annual increases unconstitutional under pension protection clause); *Schroeder v. Morton Grove Police Pension Board*, 219 Ill. App. 3d 697 (1991) (finding invalid, as violation of pension protection clause, amendment to Pension Code reducing pension benefits based on receipt of workers' compensation benefits).[12]

¶ 47    Retirement annuity benefits are unquestionably a "benefit of contractually-enforceable relationship resulting from membership" in the four State-funded retirement systems. Indeed, they are among the most important benefits provided by those systems. If allowed to take effect, Public Act 98-599, would clearly result in a diminishment of the retirement annuities to which Tier 1 members of GRS, SRS, SURS and TRS became entitled when they joined those systems. As described earlier in this opinion, the new legislation directly reduces the value of retirement annuities for those members in no fewer than five different ways. While we presume statutes to be constitutional and must construe enactments by the legislature so as to

---

[12]Additional benefits may always be added, of course (see *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d at 849), and the State may require additional employee contributions or other consideration in exchange (see *Gualano v. City of Des Plaines*, 139 Ill. App. 3d 456, 459 (1985)). However, once the additional benefits are in place and the employee continues to work, remains a member of a covered retirement system, and complies with any qualifications imposed when the additional benefits were first offered, the additional benefits cannot be unilaterally diminished or eliminated. See, *e.g.*, *Taft v. Board of Trustees of the Police Pension Fund*, 133 Ill. App. 3d 566, 572 (1985); *Carr v. Board of Trustees of the Police Pension Fund*, 158 Ill. App. 3d 7, 9-10 (1987); *cf. Kuhlmann v. Board of Trustees of the Police Pension Fund*, 106 Ill. App. 3d 603, 609 (1982) (member not eligible for increase in benefits where he had ceased contributing to the pension fund prior to the change in the law).

- 15 -

uphold their validity whenever it is reasonably proper to do so (*Wilson v. Department of Revenue*, 169 Ill. 2d 306, 310 (1996)), there is simply no way that the annuity reduction provisions in Public Act 98-599 can be reconciled with the rights and protections established by the people of Illinois when they ratified the Illinois Constitution of 1970 and its pension protection clause. Those provisions contravene the clear requirements of article XIII, section 5, as set forth in the provision's plain and unambiguous language and construed by the legion of cases we have just discussed. In enacting the provisions, the General Assembly overstepped the scope of its legislative power. This court is therefore obligated to declare those provisions invalid. *Maddux v. Blagojevich*, 233 Ill. 2d 508, 528 (2009).

¶ 48    In *Fields v. Elected Officials' Retirement Plan*, 320 P.3d 1160, 1165-68 (Ariz. 2014), the Arizona Supreme Court recently reached the same conclusion in similar circumstances based on the analogous provision of their state's constitution. As under our pension protection clause, the Arizona constitution provides that public retirement system benefits "shall not be diminished or impaired." Ariz. Const., art. XXIX, § 1(C). Applying that provision, the Arizona Supreme Court held that legislative changes to the statutory formula for pension benefit increases which diminished benefit payments violated this constitutional provision, and the court expressly rejected the argument that the term "benefit" in the constitutional provision "only includes the right to receive payments in the amount determined by the most recent calculation." *Fields*, 320 P.3d at 1165-68. The court reasoned that accepting such an argument would place even the base pension benefit outside the reach of constitutional protection because the base benefit is produced by the same statutory formula that includes benefit increases. See *id.* at 1166.

¶ 49    The "benefit" protected by the Arizona constitution's Pension Clause, the court explained, "necessarily includes the right to use the statutory formula" that determines the amount of pension annuity payments, and that formula includes the statutory benefit increases. *Id.* The court held that the plaintiff, a retired Arizona judge, "has a right in the existing formula by which his benefits are calculated as of the time he began employment and any beneficial modifications made during the course of his employment." *Id.* Accordingly, the Arizona statutory benefit increase formula was a protected pension "benefit" for purposes of the Arizona constitution's substantially identical pension protection clause. *Id.*

¶ 50    The Arizona Supreme Court added that its decision comported with judicial decisions "in other states that have similar constitutional provisions protecting public pension benefits," including Illinois. *Id.* Significantly, the court observed that Illinois courts have "determined that benefit calculation formulas are entitled to constitutional protection," and cited *Miller*, 329 Ill. App. 3d 589, for the proposition that "benefit increases" are "constitutionally protected." *Fields*, 320 P.3d at 1166.

¶ 51                                              II

¶ 52    That the annuity reduction provisions of Public Act 98-599 violate the pension protection clause's prohibition against the diminishment of the benefits of membership in a State-funded retirement system is one the State has now all but conceded. After this court reaffirmed in *Kanerva v. Weems* that the pension protection clause means precisely what it says, the State shifted its focus to an argument it did not raise and we did not consider in *Kanerva*. The State's position now rests on its affirmative defense that funding for the pension systems and State

finances in general have become so dire that the General Assembly is authorized, even compelled, to invoke the State's "reserved sovereign powers," *i.e.*, its police powers, to override the rights and protections afforded by article XIII, section 5, of the Illinois Constitution in the interests of the greater public good. This argument must also fail.

¶ 53    The circumstances presented by this case are not unique. Economic conditions are cyclical and expected, and fiscal difficulties have confronted the State before. In the midst of previous downturns, the State or political subdivisions of the State have attempted to reduce or eliminate expenditures protected by the Illinois Constitution, as the General Assembly is attempting to do with Public Act 98-599. Whenever those efforts have been challenged in court, we have clearly and consistently found them to be improper.

¶ 54    During the Great Depression, for example, the city of Chicago omitted from its annual appropriations for 1932, 1933 and 1934 a portion of the funds necessary to pay the full salaries of the chief justice and 36 associate judges of the city's municipal court. The affected judges were subject to a provision of the Illinois Constitution that prevented their compensation from being diminished during their terms of office. Their salaries were also protected from reductions by a provision of the Municipal Court Act then in effect. The judges sought relief by way of *mandamus* to compel the city to comply with the law. *People ex rel. Lyle v. City of Chicago*, 360 Ill. 25, 26-27 (1935).

¶ 55    For its defense, the city claimed that a large part of the taxes from 1929 to 1932, inclusive, were not and could not be collected, and because of "the reassessment of property in Cook county the levies and extensions of taxes were overdue from two to three years." *Id.* at 27. As a result, it faced a financial emergency which left it unable to comply with the above-noted provisions without curtailing the essential functions of government. According to the city, requiring it to pay the judges' full salaries as required by law would necessitate the cutting of other appropriations and "crippl[e] activities for the prevention of crime, fire, and the spread of disease." *Id.* at 28-29.

¶ 56    In rejecting the city's position, we acknowledged that legitimate efforts to relieve the city's difficulties were commendable. We held, however, that any departure from the law is impermissible unless justification for that departure is found within the law itself. Exigent circumstances are not enough. "Neither the legislature nor any executive or judicial officer may disregard the provisions of the constitution even in case of a great emergency." *Id.* at 29. Because the provisions prohibiting reduction in judicial salaries were plain and unequivocal and contained nothing that expressly or impliedly authorized deviation from their terms, we concluded that the city had no authority to change the judges' salaries during the terms for which they were elected. "Municipal authorities are charged by law with making all appropriations for the expenses of the municipality," we held, "and it was manifestly their duty to make the necessary appropriations for the full amount of the salaries of [these judges]. If appropriating such amounts will curtail other funds and hamper some needed activity of the city, that situation is, of course, unfortunate but does not justify the violation of the law." *Id.* at 30.

¶ 57    A similar situation was presented more recently in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286 (2004), where the governor attempted to use his veto power to eliminate a cost of living adjustment to salaries for the State's judges as part of an austerity plan. Because the adjustments were a vested component of the salaries authorized by law, however, the

- 17 -

governor's attempt to undo them violated the prohibition against diminishment of judicial salaries set forth in article VI, section 14, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 14). When the judges challenged the governor's actions on that basis in circuit court, they prevailed. On direct review, we affirmed.

¶ 58 As we had in *People ex rel. Lyle*, nearly 70 years earlier, we acknowledged that:

"substantial budgetary challenges currently confront the Governor and the General Assembly. The adverse economic conditions facing so many of our fellow citizens have taken an inevitable toll on the state's treasury. Revenues are not keeping pace. Despite ongoing efforts by the Governor and legislature, shortfalls persist. We do not mean to diminish the seriousness of the situation or appear insensitive to the difficulties faced by our coordinate branches of government. Those difficulties are undeniable, and we are highly cognizant of the need for austerity and restraint in our spending. As administrators of the judiciary, we make every effort to economize whenever and however we can. One thing we cannot do, however, is ignore the Constitution of Illinois." *Jorgensen*, 211 Ill. 2d at 316.

Once the salaries were implemented according to law, article VI, section 14, of the constitution precluded their diminishment and required that they be paid. "No principle of law permits us to suspend constitutional requirements for economic reasons," we held, "no matter how compelling those reasons may seem." *Id.* So it is with the case before us today.

¶ 59 The State seeks to avoid this conclusion by arguing that because membership in public retirement systems is an enforceable contractual relationship under article XIII, section 5, it should be subject to the same limitations as all other contractual rights; that under "a century and a half of federal and state law defining contractual relationships," these rights remain subject to modification—even invalidation—by the General Assembly through the exercise of the State's police power; and that the reduction in retirement annuity benefits under Public Act 98-599 is a valid exercise of police power because it is necessary and reasonable to secure the State's fiscal health and the well being of its citizens.

¶ 60 This argument was rejected by the circuit court. We reject it as well. As a preliminary matter, the precedent on which the State relies does not involve the pension protection clause under article XIII, section 5. It arises, instead, under article I, section 16 (Ill. Const. 1970, art. I, § 16), and that provision's counterpart in the United States Constitution (see U.S. Const., art. I, § 10, cl. 1). Those provisions, which are popularly referred to as the "contracts clause," provide that the State shall not pass any "law impairing the obligation of contracts." The State points out that case law interpreting these provisions has recognized that the prohibition against impairment of contracts is not absolute and "does not immunize contractual obligations from every conceivable kind of impairment or from the effect of a reasonable exercise by the States of their police power." *George D. Hardin, Inc. v. Village of Mount Prospect*, 99 Ill. 2d 96, 103 (1983). The police power is "incapable of alienation" (*City of Chicago v. Chicago Union Traction Co.*, 199 Ill. 259, 270 (1902)), the State observes, and it has long been recognized that it may, in the exercise of its police powers, enact "regulations reasonably necessary to secure the health, safety, morals or general welfare of the community, even though contracts may thereby be affected" (*City of Chicago v. Chicago & North Western Ry. Co.*, 4 Ill. 2d 307, 317 (1954)).

¶ 61    While these principles sound expansive, legislation impairing contracts has actually been upheld against contract clause challenges only rarely. *George D. Hardin, Inc. v. Village of Mount Prospect*, 99 Ill. 2d at 104. When the legislation has been directed at reducing pension benefits of State employees, this court has expressly held that it is "not defensible as a reasonable exercise of the State's police powers" and declared it invalid under the contracts clause, as well as for other reasons. *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d at 167; *Bardens v. Board of Trustees of the Judges Retirement System*, 22 Ill. 2d 56, 61-62 (1961).

¶ 62    This is not surprising. While impairment of a contract may survive scrutiny under the contracts clause if reasonable and necessary to serve an important public purpose, " '[t]he severity of the impairment measures the height of the hurdle the state legislation must clear.' " *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d at 166 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)). Changes in the factors used to compute public pension benefits constitute an impairment which is "obviously substantial." *Id.*

¶ 63    Moreover, the United States Supreme Court has held that particular scrutiny of legislative action is warranted when, as here, a state seeks to impair a contract to which it is itself a party and its interest in avoiding the contract or changing its terms is financial. Committing to a contract does implicate the state's sovereign power, but:

> "[w]hatever the propriety of a State's binding itself to a future course of conduct in other contexts, the power to enter into effective financial contracts cannot be questioned. Any financial obligation could be regarded in theory as a relinquishment of the State's spending power, since money spent to repay debts is not available for other purposes. Similarly, the taxing power may have to be exercised if debts are to be repaid. Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 24 (1977).

¶ 64    In addition, because the state's self-interest is at stake whenever it seeks to modify its own financial obligations, the United States Supreme Court has made clear that it is not appropriate to give the state's legislature the same deference it would otherwise be afforded with regard to whether the impairment is reasonable and necessary to serve an important public purpose. "A governmental entity can always find a use for extra money," the Court observed, "especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." *Id.* at 25-26.

¶ 65    In assessing claims by the state that impairment of a contract is "necessary" to advance the public interest, courts consider whether the provisions which the state seeks to change had effects which were unforeseen and unintended by the legislature when initially adopted and whether the state could achieve its purposes through less drastic measures. *Id.* at 30-32. In this case, the State seeks remand to permit it to develop a more complete evidentiary record on these questions. Such a remand, however, would serve no purpose. Based on the facts already of record and the matters of which we can take judicial notice, it is manifest that the State could not, as a matter of law, clear the threshold imposed under contemporary contract clause jurisprudence.

¶ 66    As this opinion has previously observed, our economy is and has always been subject to fluctuations, sometimes very extreme fluctuations. Throughout the past century, market forces have periodically placed significant pressures on public pension systems. The repercussions of underfunding those pension systems in such an environment have been well-documented and were well-known when the General Assembly enacted the provisions of the Pension Code which Public Act 98-599 now seeks to change. The General Assembly had available to it all the information it needed to estimate the long-term costs of those provisions, including the costs of annual annuity increases, and the provisions have operated as designed.[13] The General Assembly understood that the provisions would be subject to the pension protection clause. In addition, the law was clear that the promised benefits would therefore have to be paid, and that the responsibility for providing the State's share of the necessary funding fell squarely on the legislature's shoulders. Accordingly, the funding problems which developed were entirely foreseeable. The General Assembly may find itself in crisis, but it is a crisis which other public pension systems managed to avoid and, as reflected in the SEC order, it is a crisis for which the General Assembly itself is largely responsible.

¶ 67    Moreover, no possible claim can be made that no less drastic measures were available when balancing pension obligations with other State expenditures became problematic. One alternative, identified at the hearing on Public Act 98-599, would have been to adopt a new schedule for amortizing the unfunded liabilities. The General Assembly could also have sought additional tax revenue. While it did pass a temporary income tax increase, it allowed the increased rate to lapse to a lower rate even as pension funding was being debated and litigated.

¶ 68    That the State did not select the least drastic means of addressing its financial difficulties is reinforced by the legislative history. As noted earlier in this opinion, the chief sponsor of the legislation stated candidly that other alternatives were available. Public Act 98-599 was in no sense a last resort. Rather, it was an expedient to break a political stalemate.

¶ 69    The United States Supreme Court has made clear that the United States Constitution "bar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole [citations]." (Internal quotation marks omitted.) *United States v. Winstar Corp.*, 518 U.S. 839, 883 (1996). Through Public Act 98-599, however, the General Assembly addressed the financial challenges facing our State by doing just that. It made no effort to distribute the burdens evenly among Illinoisans. It did not even attempt to distribute the burdens evenly among those with whom it has contractual relationships. Although it is undisputed that many vendors face delays in payment, the terms of their contracts are unchanged, and under the State Prompt Payment Act, vendors are actually entitled to additional compensation in the form of statutory interest if their bills are not paid within specified periods. 30 ILCS 540/3-2 (West 2012). In no sense is this comparable to the situation confronted by members of public retirement systems under Public Act 98-599, which, if allowed to take effect, would actually negate substantive terms of their contractual relationships and reduce the benefits due and payable to them in a real and absolute way. Under all of these circumstances, it is clear that the State could prove no set of circumstances that

_____

[13]While the automatic annual increases have sometimes exceeded changes in the cost of living, these adjustments are not cost of living adjustments, and as indicated earlier in this disposition, the increases have actually lagged behind the average increases granted by the Social Security Administration, which are tied to the cost of living.

would satisfy the contracts clause. Its resort to the contracts clause to support its police powers argument must therefore be rejected as a matter of law.

¶ 70    The State's police powers defense is fatally flawed for other reasons as well. Just as the legislature is presumed to act with full knowledge of all prior legislation, the drafters of a constitutional provision are presumed to know about existing laws and constitutional provisions and to have drafted their provision accordingly. *Kanerva v. Weems*, 2014 IL 115811, ¶ 41. The contracts clause had antecedents in the very first Illinois Constitution and in the Constitution of the United States. When the time came to address the protection for public pensions, the drafters of the 1970 Constitution therefore presumably knew of the substantial body of case law involving that clause, including the case law holding that, when warranted, the protections afforded contracts could be modified through the exercise of the State's police powers. That, however, is not the standard they chose with respect to the benefits of membership in public pension systems.

¶ 71    There are numerous instances in the Constitution of 1970 where the drafters specifically provided that particular constitutional guarantees were to remain subject to the authority of the State to step in when public safety and welfare required. See Ill. Const. 1970, art. I, § 22 (right of individual citizens to keep and bear arms shall not be infringed "[s]ubject only to the police power"); Ill. Const. 1970, art. I, § 9 (privilege of writ of *habeas corpus* shall not be suspended "except in cases of rebellion or invasion when the public safety may require it"); Ill. Const. 1970, art. I, § 3 (rights of religious freedom shall not be construed to "justify practices inconsistent with the peace or safety of the State"); Ill. Const. 1970, art. XI, § 2 (right to healthful environment "subject to reasonable limitation and regulation as the General Assembly may provide by law"). When it came time to address the rights conferred by membership in public pension systems, however, the drafters included no similar reservation of authority.

¶ 72    This decision was not inadvertent. During the convention on the 1970 Illinois Constitution, the suggestion was made that public pensions be addressed through the same "impair[ment] [of] the obligation *** contracts" provision now included in article I, section 16 (Ill. Const. 1970, art. I, § 16). 4 Record of Proceedings 2930 (statements of Delegate Whalen). That proposal, however, was rejected in favor of the separate, more specific provisions of article XIII, section 5 (Ill. Const. 1970, art. XIII, § 5). Those provisions not only created a new right of constitutional dimension, conferring enforceable contractual status on the benefits of membership in public retirements systems, they also defined the scope of the protection afforded such benefits. Under the plain language of article XIII, section 5, not only may the benefits not be impaired, they also may not be "diminished." That is same term used in article VI, section 14 (Ill. Const. 1970, art. VI, § 14), which protects the salaries of judges against reduction during their terms of office and which was enforced by this court in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286 (2004), discussed earlier in this opinion, notwithstanding the State's claims of economic hardship.

¶ 73    We note, moreover, that after the drafters of the 1970 Constitution initially approved the pension protection clause, a proposal was submitted to Delegate Green by the chairperson of the Illinois Public Employees Pension Laws Commission, an organization established by the General Assembly to, *inter alia*, offer recommendations regarding the impact of proposed pension legislation. See Ill. Rev. Stat. 1969, ch. 108½, ¶¶ 22-801, 22-802, regarding the

wording of the new provision. The proposal criticized the language approved by the drafters on the grounds that it would curtail the powers of the legislature and limit its authority. It recommended that additional introductory language be added specifying that the rights conferred thereunder were "[s]ubject to the authority of the General Assembly to enact reasonable modifications in employee rates of contribution, minimum service requirements and the provisions pertaining to the fiscal soundness of the retirement systems."

¶ 74    Delegate Green subsequently advised the chairman that he would not offer it because "he could get no additional delegate support for the proposed amendment." Report of the Illinois Public Pension Laws Commission 66 (1971). Shortly thereafter, a member of the Pension Laws Commission sent a follow-up letter to Delegate Green requesting that he read a statement into the convention record expressing the view that the new provision should not be interpreted as reflecting an intent to withdraw from the legislature "the authority to make reasonable adjustments or modifications in respect to employee and employer rates of contribution, qualifying service and benefit conditions, and other changes designed to assure the financial stability of pension and retirement funds" and that "[i]f the provision is interpreted to preclude any legislative changes which may in some incidental way 'diminish or impair' pension benefits it would unnecessarily interfere with a desirable measure of legislative discretion to adopt necessary amendments occasioned by changing economic conditions or other sound reasons." Letter and Enclosed Statement of Rubin G. Cohn, Member of the Illinois Public Employees Pension Laws Commission to Delegate Henry Green (Aug. 27, 1970), Papers of Henry I. Green, Box 1, Folder 13 (University of Illinois Library at Urbana-Champaign, Illinois History and Lincoln Collections). This effort also proved unsuccessful. The statement was not read and no action was taken during the convention to include language allowing a reasonable power of legislative modification. *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d at 851.

¶ 75    Given the history of article XIII, section 5, and the language that was ultimately adopted, we therefore have no possible basis for interpreting the provision to mean that its protections can be overridden if the General Assembly deems it appropriate (see *id*.), as it sometimes can be under the contracts clause. To confer such authority on the legislature through judicial fiat would require that we ignore the plain language of the constitution and rewrite it to include "restrictions and limitations that the drafters did not express and the citizens of Illinois did not approve." *Kanerva v. Weems*, 2014 IL 115811, ¶ 41. Indeed, accepting the State's position that reducing retirement benefits is justified by economic circumstances would require that we allow the legislature to do the very thing the pension protection clause was designed to prevent it from doing. Article XIII, section 5, would be rendered a nullity.

¶ 76    The State protests that this conclusion is tantamount to holding that the State has surrendered its sovereign authority, something it may not do. The State is incorrect. Article XIII, section 5, is in no sense a surrender of any attribute of sovereignty. Rather, it is a statement by the people of Illinois, made in the clearest possible terms, that the authority of the legislature does not include the power to diminish or impair the benefits of membership in a public retirement system. This is a restriction the people of Illinois had every right to impose.

¶ 77    Unlike Great Britain, where the sovereignty of the nation resides in Parliament, "[u]nder our institutions this sovereignty or transcendent power of government resides in or with the people." *Hawthorn v. People*, 109 Ill. 302, 305-06 (1883). See 33A Ill. L. and Prac. *State*

*Government* § 3 (2012). Sovereignty is lodged in the people (*People ex rel. Dickinson v. Board of Trade*, 193 Ill. 577, 589 (1901)), and the people are the sovereign power (*Field v. People ex rel. McClernand*, 3 Ill. 79, 110-11 (1839)). The people therefore possess all power originally, including all legislative power. *Harder's Fire Proof Storage & Van Co. v. City of Chicago*, 235 Ill. 58, 68 (1908).

¶ 78     As the ultimate sovereign, the people can, "within constitutional restrictions imposed by the Federal constitution, delegate the powers of government to whom and as they please. They can withhold or [e]ntrust it, with such limitations as they choose." *Hawthorn v. People*, 109 Ill. at 306; accord *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 672 (1976) ("all power derives from the people" who can delegate it to representative instruments which they create or reserve to themselves the power to deal directly with matters which might otherwise be assigned to the legislature).[14] The powers they have reserved are shown in the prohibitions set forth in their state constitutions. *Munn v. Illinois*, 94 U.S. 113, 124 (1876).

¶ 79     The people of Illinois give voice to their sovereign authority through the Illinois Constitution. It is through the Illinois Constitution that the people have decreed how their sovereign power may be exercised, by whom and under what conditions or restrictions. Where rights have been conferred and limits on governmental action have been defined by the people through the constitution, the legislature cannot enact legislation in contravention of those rights and restrictions. Our court made this clear in an opinion published 186 years ago in the very first volume of our official reports. As we explained then, the constitution "is the form of government instituted by the people in their sovereign capacity, in which first principles and fundamental law are established. [It] is the supreme, permanent and fixed will of the people in their original, unlimited and sovereign capacity, and in it are determined the condition, rights and duties of every individual of the community." *Phoebe v. Jay*, 1 Ill. 268, 271 (1828). "From the decrees of the constitution there can be no appeal, for it emanates from the highest source of power, the sovereign people. Whatever condition is assigned to any portion of the people by the constitution, is irrevocably fixed ***." *Id.*

¶ 80     These constraints apply to the legislature. While the constitution grants general legislative authority to the General Assembly, the General Assembly must exercise that authority in conformity with the constitution's provisions. *Neiberger v. McCullough*, 253 Ill. 312, 322 (1912). It cannot exceed the bounds imposed by the constitution or, through legislative decree, seek to alter them, for the constitution "can establish no tribunal with power to abolish that which gave and continues such tribunal in existence." *Phoebe v. Jay*, 1 Ill. 2d at 271. In contrast to a constitutional mandate, a legislative act is but "the will of the legislature, in a derivative and subordinate capacity. *The constitution is their commission, and they must act within the pale of their authority, and all their acts, contrary or in violation of the constitutional charter, are void.*" (Emphasis added.) *Id.*

¶ 81     In accordance with these principles, we have repeatedly held that the General Assembly cannot enact legislation that conflicts with provisions of the constitution unless the constitution specifically grants it such authority. *O'Brien v. White*, 219 Ill. 2d 86, 100 (2006); *Thies v. State*

---

[14]We note, moreover, that which reserved powers a state government may exercise is a question for the people of that state (see *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 847-48 (1995) (Thomas, J., dissenting, joined by Rehnquist, C.J., and O'Connor and Scalia, JJ.)), not the federal courts (see *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 457 (1793)).

*Board of Elections*, 124 Ill. 2d 317, 325-26 (1988) (where constitution sets forth qualifications for office, legislature cannot change or add to those qualifications unless the constitution gives it that power). Police powers are no exception to this rule. Although the police powers of the legislature are broad and far-reaching, our case law makes clear that their exercise must not conflict with the constitution. *City of Belleville v. St. Clair County Turnpike Co.*, 234 Ill. 428, 437 (1908). If the constitution mandates that something be done or not done, the legislature may not rely on its police powers to violate that mandate (*People v. Adams*, 149 Ill. 2d 331, 339-40 (1992); *People v. Warren*, 11 Ill. 2d 420, 424 (1957)) or override express constitutional guarantees (see *Heimgaertner v. Benjamin Electric Manufacturing Co.*, 6 Ill. 2d 152, 158-59 (1955)). See also *Client Follow-Up Co. v. Hynes*, 75 Ill. 2d 208, 215 (1979) ("limitations written into the Constitution are restrictions on legislative power and are enforceable by the courts").

¶ 82　　Article XIII, section 5, of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5) expressly provides that the benefits of membership in a public retirement system "shall not be diminished or impaired." Through this provision, the people of Illinois yielded none of their sovereign authority. They simply withheld an important part of it from the legislature because they believed, based on historical experience, that when it came to retirement benefits for public employees, the legislature could not be trusted with more. As we discussed in *Kanerva v. Weems*, 2014 IL 115811, ¶ 45, and noted earlier in this opinion, delegates to the constitutional convention were "mindful that in the past, appropriations to cover state pension obligations had 'been made a political football' and 'the party in power would just use the amount of the state contribution to help balance budgets,' jeopardizing the resources available to meet the State's obligations to participants in its pension systems in the future." They understood that steps were necessary "in order to protect 'public employees who are beginning to lose faith in the ability of the state and its political subdivisions to meet these benefit payments' and to address the 'insecurity on the part of the public employees [which] is really defeating the very purpose for which the retirement system was established ***.' " *Id.* ¶ 46 (quoting 4 Record of Proceedings 2925 (statements of Delegate Green)). And they wanted to make certain "that irrespective of the financial condition of a municipality or even the state government, that those persons who have worked for often substandard wages over a long period of time could at least expect to live in some kind of dignity during their golden years ***." (Internal quotation marks omitted.) *Id.*

¶ 83　　When Delegate Green presented article XIII, section 5, to the Convention, he summed it up as follows:

> " 'What we are trying to do is to mandate the General Assembly to do what they have not done by statute. ***
>
> 　　Now, I think they either ought to live up to the laws that they pass or that very quickly we ought to stop when we are hiring public employees by telling them that they have any retirement rights in the state of Illinois. If we are going to tell a policeman or a school teacher that, "Yes, if you will work for us for your thirty years or until whenever you reach retirement age, that you will receive this," if the state of Illinois and its municipalities are going to play insurance company and live up to these contributions, then they ought to live by their own rules. ***.' [Citation.]" *Id.* ¶ 47.

- 24 -

¶ 84    The concerns of the delegates who drafted article XIII, section 5, and the citizens who ratified it have proven to be well founded. Even with the protections of that provision, the General Assembly has repeatedly attempted to find ways to circumvent its clear and unambiguous prohibition against the diminishment or impairment of the benefits of membership in public retirement systems. Public Act 98-599 is merely the latest assault in this ongoing political battle against public pension rights. As we noted earlier, through that legislation the General Assembly is attempting to do once again exactly what the people of Illinois, through article XIII, section 5, said it has no authority to do and must not do.

¶ 85    The General Assembly may not legislate on a subject withdrawn from its authority by the constitution (see *Hunt v. Rosenbaum Grain Corp.*, 355 Ill. 504, 509 (1934); *City of Chicago v. County of Cook*, 370 Ill. 301, 306 (1938)), and it cannot rely on police powers to overcome this limitation. As we have already explained, there simply is no police power to disregard the express provisions of the constitution. It could not be otherwise, for if police powers could be invoked to nullify express constitutional rights and protections whenever the legislature (or other branches of government) felt that economic or other exigencies warranted, it is not merely pension benefits of public employees that would be in jeopardy. No rights or property would be safe from the State. Today it is nullification of the right to retirement benefits. Tomorrow it could be renunciation of the duty to repay State obligations. Eventually, investment capital could be seized. Under the State's reasoning, the only limit on the police power would be the scope of the emergency. The legislature could do whatever it felt it needed to do under the circumstances. And more than that, through its funding decisions, it could create the very emergency conditions used to justify its suspension of the rights conferred and protected by the constitution. If financial markets were rational, this prospect would not buoy our economy, it would ruin it.

¶ 86    Adherence to constitutional requirements often requires significant sacrifice, but our survival as a society depends on it. The United States Supreme Court made the point powerfully nearly a century and a half ago when it struck down as unconstitutional President Lincoln's use of executive authority to suspend the writ of *habeas corpus* during the Civil War, a period of emergency that, by any measure, eclipsed the one facing our General Assembly today. In rejecting the government's argument that wartime concerns justified the curtailment of the constitutional protections, the Supreme Court employed language which seems appropriate to this case:

    "Time has proven the discernment of our ancestors; for even these provisions, expressed in such plain English words, that it would seem the ingenuity of man could not evade them, are *now*, after the lapse of more than seventy years, sought to be avoided. Those great and good men foresaw that troublous times would arise, when rulers and people would become restive under restraint, and seek by sharp and decisive measures to accomplish ends deemed just and proper; and that the principles of constitutional liberty would be in peril, unless established by irrepealable law. The history of the world had taught them that what was done in the past might be attempted in the future. The Constitution *** is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during

any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism ***." (Emphasis in original.) *Ex parte Milligan*, 71 U.S. 2, 120-21 (1866).

¶ 87 The financial challenges facing state and local governments in Illinois are well known and significant. In ruling as we have today, we do not mean to minimize the gravity of the State's problems or the magnitude of the difficulty facing our elected representatives. It is our obligation, however, just as it is theirs, to ensure that the law is followed. That is true at all times. It is especially important in times of crisis when, as this case demonstrates, even clear principles and long-standing precedent are threatened. Crisis is not an excuse to abandon the rule of law. It is a summons to defend it. How we respond is the measure of our commitment to the principles of justice we are sworn to uphold.

¶ 88 More than two centuries ago, as adoption of the Constitution of the United States was being considered by the citizens of our new nation, James Madison wrote:

"If men were angels, no government would be necessary. *** In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself." James Madison, Federalist No. 51 (1788).

¶ 89 Obliging the government to control itself is what we are called upon to do today. The Constitution of Illinois and the precedent of our court admit of only one conclusion: the annuity reduction provisions of Public Act 98-599 enacted by the legislature and signed into law by the Governor violate article XIII, section 5's express prohibition against the diminishment of the benefits of membership in public retirement systems. The circuit court was therefore entirely correct when it declared those provisions void and unenforceable.

¶ 90                                             III

¶ 91 We come, then, to the third and final issue presented by this appeal: are the invalid annuity reduction provisions of Public Act 98-599 severable from the remainder of the statute? The issue of severability involves a question of statutory construction, which primarily involves ascertaining and giving effect to the intent of the legislature. In determining whether a statutory provision containing an unconstitutional portion may be severed from the rest of a statute, we look first at the statute's own specific severability provision, if it has one. *People v. Mosley*, 2015 IL 115872, ¶ 29. Public Act 98-599 does.

¶ 92 The Act includes a provision dealing with the "severability and inseverability" of the law's numerous components. Set forth in section 97 of the statute, this severability provision states that the various sections of the law are severable under section 1.31 of the Statute on Statutes (5 ILCS 70/1.31 (West 2012)), with the exception of certain specific sections. Under the Act, those particular sections, 39 of them in all, "are mutually dependent and inseverable from one another but are severable from any other provision of this Act." Pub. Act 98-599, § 97 (eff. June 1, 2014).

¶ 93 Among the 39 sections deemed "inseverable" are some of the specific provisions which impermissibly reduce retirement annuity benefits in violation of the pension protection clause. These include sections 2-119.1(a-1), 14-114(a-1), 15-136(d-1), and 16-133.1(a-1) (40 ILCS 5/2-119.1(a-1), 14-114(a-1), 15-136(d-1), 16-133.1(a-1) (West Supp. 2013)), which adversely affect the value of annual annuity increases. Under the express terms of section 97 of the Act itself, all 39 of the "inseverable" provisions must therefore fall with the provisions we have

- 26 -

declared unconstitutional. When one eliminates those 39 provisions along with all the other annuity-reducing portions of the law that are void and enforceable under the pension protection clause, Public Act 98-599 all but evaporates.

¶ 94 Severability principles would doom the statute in any case. Under Illinois law, severability clauses are not conclusive. That is because a court's authority to eliminate invalid elements of an act and yet sustain its valid provisions derives not from legislative fiat, but from powers inherent in the judiciary. The practice of holding statutory provisions severable from those that are found to be invalid originated in the courts long before severability clauses were adopted by legislatures. Although the use of severability clauses has now become common practice, we have noted that they are regarded as little more than a formality. *Cincinnati Insurance Co. v. Chapman*, 181 Ill. 2d 65, 81 (1998).

¶ 95 Even when a statute contains an express severability clause, the clause is merely viewed as reflecting a rebuttable presumption of legislative intent. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 460 (1997). The presumption of severability reflected in an express severability clause will be overcome, and the entire statute will be held unconstitutional, if the legislature would not have passed the law without the provisions deemed invalid. To determine whether the legislature would not have passed the law without the invalid parts, the courts consider whether the legislative purpose in passing the act is significantly undercut or altered by the elimination of those invalid sections. Even in cases where the valid sections of an act are complete and capable of being executed, the entire act will be declared void if, after striking the invalid provisions, the part that remains does not reflect the legislature's purpose in enacting the law. *Id.* at 461-62.

¶ 96 Applying these principles to the case before us, there can be no serious question that, with invalidation of those provisions of Public Act 98-599 which reduce the retirement annuities Tier 1 members of the GRS, SERS, SURS and TRS are entitled to receive, the entire statute must fall. As noted earlier in this opinion, the legislation's proponents described its numerous provisions as "all part of an integral bipartisan package." The overarching purpose of the law was to shore up State finances, improve its credit rating and free up resources for other purposes by reducing, *i.e.*, diminishing, the amount of retirement annuity benefits paid to Tier 1 members of GRS, SERS, SURS, and TRS, particularly annual annuity increases, which the speaker of the House of Representatives himself referred to as the chief cause of the financial problems the Act was intended to address. 98th Ill. Gen. Assem., House Proceedings, Dec. 3, 2013, at 7 (statements of Representative Madigan). The annuity reduction provisions are therefore not merely central to the statute, they are its very reason for being. Without them, the legislature would not have enacted the law at all. To leave those remaining provisions standing once the core sections are stripped away would, under these circumstances, yield a legislation package that no longer reflects the legislature's intent. The circuit court was therefore correct when it concluded that Public Act 98-599 is void and unenforceable in its entirety.[15]

---

[15]The legislature is, of course, free to reenact any provisions of Public Act 98-599 that do not violate the constitution. See *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 250 (2010).

¶ 97                                  CONCLUSION

¶ 98        For the foregoing reasons, the judgment of the circuit court declaring Public Act 98-599 to
be unconstitutional and permanently enjoining its enforcement is affirmed.

¶ 99        Affirmed.