**2016 IL 119618**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————

(Docket Nos. 119618, 119620, 119638, 119639, 119644 cons.)

MARY J. JONES *et al.*, Appellees, v. MUNICIPAL EMPLOYEES' ANNUITY AND BENEFIT FUND OF CHICAGO *et al.*, Appellants.

*Opinion filed March 24, 2016.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Thomas, Kilbride, and Karmeier concurred in the judgment and opinion.

Justices Freeman and Burke took no part in the decision.

## OPINION

¶ 1        The question presented in this consolidated appeal is whether Public Act 98-641 (eff. June 9, 2014) (Act), which amends the Illinois Pension Code as it pertains to certain pension funds for employees of the city of Chicago, violates the pension protection clause of the Illinois Constitution. Ill. Const. 1970, art. XIII, § 5. On motions for summary judgment, the circuit court of Cook County declared the Act to be unconstitutional in its entirety and permanently enjoined its enforcement because it diminished pension benefits in violation of the pension protection clause. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3        Illinois has established various public pension systems, including four pensions
for public employees of the city of Chicago (the City). These pension funds include
the Municipal Employees', Officers', and Officials' Annuity and Benefit Fund
(MEABF) (40 ILCS 5/8-101 *et seq.* (West 2012)), the Laborers' and Retirement
Board Employees' Annuity and Benefit Fund (LABF) (40 ILCS 5/11-101 *et seq.*
(West 2012)), the Firemen's Annuity and Benefit Fund (FABF) (40 ILCS 5/6-101
*et seq.* (West 2012)), and the Policemen's Annuity and Benefit Fund (PABF) (40
ILCS 5/5-101 *et seq.* (West 2012)).

¶ 4        At issue in this appeal are the City pensions impacted by Public Act 98-641,
which include MEABF and LABF (collectively the Funds). Participants in the
MEABF include most civil servant employees of the City, as well as nonteacher
employees of the Chicago public school system. 40 ILCS 5/8-107 (West 2012).
Participants in the LABF include primarily labor service workers. 40 ILCS
5/11-110 (West 2012). These funds operate in a similar way to the state-funded
retirement systems, in many respects. The City pension funds are all subject to the
pension protection clause of the Illinois Constitution, which provides:
"Membership in any pension or retirement system of the State, any unit of local
government or school district, or any agency or instrumentality thereof, shall be an
enforceable contractual relationship, the benefits of which shall not be diminished
or impaired." Ill. Const. 1970, art. XIII, § 5. Also, the City pension funds provide
traditional defined benefit plans under which members receive specified annuities
upon retirement generally based upon the member's salary, years of service, and
age at retirement.

¶ 5        As with the state-funded pensions, prior to the enactment of Public Act 98-641,
for employees hired prior to January 1, 2011, annuity payments under the Funds
were subject to 3% automatic annual increases beginning after the member's first
full year of retirement, and compounded annually. 40 ILCS 5/8-137, 8-137.1,
11-134.1, 11-134.3 (West 2012). For employees hired after January 1, 2011, the
annuity adjustments were tied to the Consumer Price Index. 40 ILCS 5/1-160 (West
2012).

¶ 6        The benefits under MEABF and LABF are funded from three sources:
contributions from the City, contributions from the employees, and investment
returns. Prior to Public Act 98-641, the employees contributed 8.5% of their salary

                                        - 2 -

toward their pension on an annual basis.[1] 40 ILCS 5/8-137(b), 8-174(a), 8-182, 11-134.1, 11-170, 11-174 (West 2012). The City contributed an amount based on a fixed multiplier, 1 or 1.25 times the annual employee contributions (40 ILCS 5/8-173(a), 11-169 (West 2012)), which was historically paid largely from property tax proceeds.

¶ 7        As we explained in *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 11 (hereinafter referred to as *Heaton*), the public pensions, including the City pensions, have been historically inadequate to cover the benefits owed to members. The specific concerns over funding deficiencies in the City pension funds have been well documented. As reported in 1949, "every fund in Illinois suffers at this time an actuarial insolvency." Report of the Illinois Public Employees Pension Laws Commission of 1949, 10 (1949). In 1969, the Illinois Pension Laws Commission explained:

> "The inadequacy of the provisions for financing the employer's share of the cost contained in the pension laws enacted many years ago has resulted in large unfunded accrued liabilities. The revenue provisions have not been sufficiently flexible to meet the increasing costs occasioned by salary increases and additions to membership. The method of financing the employer's obligation by means of fixed tax levies or arbitrary state appropriations is outmoded and fails to provide revenues sufficient to meet not only the accruing service cost but also interest on the accrued liability." Report of the Illinois Pension Laws Commission of 1969, 106 (1969).

¶ 8        These concerns over the ongoing funding deficiencies led to the adoption of the pension protection clause in 1970. At the constitutional convention, Delegate Kinney raised specific issues relevant to the City pensions. She particularly noted the concerns related to the proposed adoption of home rule powers for municipalities, including that the municipalities might abandon their pension obligations, leaving civil servants unprotected. 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2926 (statements of Delegate Kinney).

¶ 9        "The solution proposed by the drafters and ultimately approved by the people of Illinois was to protect the benefits of membership in public pension systems not by dictating specific funding levels, but by safeguarding the benefits themselves."

---

[1]This percentage includes contributions for the age and service annuity, widow's annuity, and the contributions toward the compounded annual annuity increases.

*Heaton*, 2015 IL 118585, ¶ 15. The drafters intended that, by guaranteeing pension benefits, the General Assembly would "take the necessary steps to fund the pension obligations." 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2925 (statements of Delegate Green).

¶ 10 Despite the warnings that the funding mechanism was not sufficient to cover the projected future benefits, and the adoption of the pension protection clause, the method of funding remained static with respect to the MEABF and the LABF. The Pension Code continued to set City contribution levels at a fixed multiple of employee contributions. This contribution level had no relationship to the obligations that the funds were accruing. Annual actuarial valuations of the Funds continued to show that the actuarially required contributions needed to fund the benefits were not being met.

¶ 11 For example, in the 2007 Comprehensive Annual Financial Report, the MEABF Board reported that instead of a multiple of 1.25 times the employee contributions received, the most recent actuarial valuation "shows that an employer contribution multiple of 2.97 is needed to adequately finance the Plan." Municipal Employees' Annuity and Benefit Fund of Chicago, 2007 Comprehensive Annual Financial Report 9, *available at* http:www.meabf.org/assets/pdfs/pubs/ 2007CAFR.pdf. The MEABF Board also noted that the "statutory employer contributions have been less than the Annual Required Contribution (ARC) for the past five years and are again expected to be less than the ARC for 2008." *Id.* at 64. The method of funding also failed to account for downturns in the economy which affected the performance of the Funds' investments. Thus, the City pension funds continued to remain vulnerable, ultimately carrying significant unfunded liabilities.

¶ 12 It was undisputed that if the funds remained on the same trajectory they would continue to pay out more in benefits than they received in contributions and investment returns, leading to a path of insolvency. It is now projected that without reforms, the MEABF and LABF will be insolvent in about 10 and 13 years, respectively.

¶ 13 Against this backdrop, as with the state-funded pensions, the General Assembly adopted several legislative strategies to deal with the underfunded City pensions. In 2011, the Pension Code was amended to require, starting in 2015, that the City contribute amounts sufficient to enable the Chicago police and firefighter pension funds to reach 90% actuarial funding by 2040. See Pub. Act 96-1495, § 5 (eff. Jan.

1, 2011).[2] No such legislation was passed with respect to the MEABF and the LABF at that time. Instead, in 2014, the General Assembly ultimately enacted Public Act 98-641, the legislation at issue in this case.

¶ 14    Introduced as Senate Bill 1922, Public Act 98-641 was intended to "address an immediate funding crisis that threatens the solvency and sustainability of the public pension systems *** serving employees of the City of Chicago." Pub. Act 98-641, § 1 (eff. June 9, 2014). The General Assembly expressly found that the financial crisis could not be addressed by increased funding alone, without also increasing employee contribution rates and reducing the annual adjustments for current and future retirees. *Id.*

¶ 15    Under the Act, the City's funding contribution progressively increases leading to actuarially-based payments beginning in 2021 to bring the funds to 90% funding levels by 2055. 40 ILCS 5/8-173(a-5), 11-169(a-5) (West 2014). However, for the first five years, from 2016-2020, the City would continue to contribute under the current multiplier framework, with an increased rate each year. *Id.*

¶ 16    Additionally, if the City fails to timely pay the required contributions, the Funds may certify the delinquent amounts to the Comptroller. Beginning in 2016, the Comptroller "must *** deduct and deposit into the Fund[s] the certified amounts or a portion of those amounts" specified from the grants of state funds to the City. 40 ILCS 5/8-173(a-10), 11-169(a-10) (West 2014). If the City fails to make its contributions to the Funds, the Act provides a mechanism by which the retirement boards of these Funds may initiate *mandamus* proceedings in the circuit court. 40 ILCS 5/8-173.1(a), 11-169.1(a) (West 2014). The court may order a reasonable payment schedule "without significantly imperiling the public health, safety, or welfare." 40 ILCS 5/8-173.1(b), 11-169.1(b) (West 2014).

¶ 17    The Act also increases the required employee contributions for members of the Funds. Instead of contributing 8.5% of their salary, the Act increases member contributions by .5% each year from 2015 to 2019, when the contribution reaches 11% of their salary. The contribution then remains fixed at 11% unless the funds reach a 90% funding ratio, at which point member contributions would decrease to 9.75% so long as the fund maintains the 90% ratio. If the funds fall below that

---

[2]An actuarial funding percentage is the value of plan assets, divided by plan liabilities. Thus, a funding percentage of 90% would mean a fund has $0.90 for each $1 of fund liability.

mark, the employee contribution increases again to 11% of their salaries. 40 ILCS 5/8-174, 11-170 (West 2014).

¶ 18    Similar to Public Act 98-599, which was found unconstitutional in *Heaton*, the Act includes a comprehensive set of provisions designed to reduce annuity benefits for members of MEABF and LABF. The Act replaces the former provisions under which retirees receive flat 3% annual increases with a new system which limits the amount of annual increases. The increase is now equal to the lesser of three percent or half the annual unadjusted percentage increase in the Consumer Price Index. 40 ILCS 5/8-137(b-5)(3), 11-134.1(b-5)(3) (West 2014). The Act additionally removes the compounding component, and instead of an annual increase, eliminates the increases entirely in specific years, and postpones the time when a retiree begins receiving the initial increase. [3] 40 ILCS 5/8-137(b-5)(1), (2), 11-134.1(b-5)(1), (2) (West 2014).

¶ 19    After the Act was signed into law, two separate lawsuits challenging its constitutionality were filed in the circuit court of Cook County in December 2014: Jones v. MEABF, No. 2014 CH 20027 (Cir. Ct. Cook Co.), and Johnson v. MEABF, No. 2014 CH 20668 (Cir. Ct. Cook Co.). The Jones plaintiffs include 14 individual participants in the MEABF, some of whom are current employees and others who are retirees currently receiving an annuity, as well as four labor unions whose members are participants in the MEABF.[4] The defendants include MEABF and its board of trustees. The Johnson plaintiffs include one current employee participant in the MEABF, three retiree participants currently receiving annuities from the LABF, and the Municipal Employees Society of Chicago. The defendants include MEABF and LABF.

¶ 20    Both complaints sought a declaration that Public Act 98-641 is unconstitutional in violation of the pension protection clause because it diminishes pension benefits, and sought to enjoin its enforcement. The City and the State were permitted to intervene in both cases to defend the constitutionality of the Act. Thereafter, the City filed an affirmative defense that the Act represented a valid exercise of the City's reserved sovereign powers to modify contractual rights and obligations.

---

[3]For retirees with an annual annuity of less than $22,000, the increase may not be less than 1% in non-suspended years and is equal to 1% in suspended years. 40 ILCS 5/8-137(b-5)(4), 8-137.1(b-5)(3) (West 2014).

[4]These unions include the American Federation of State, County and Municipal Employees Council 31, Chicago Teachers Union Local 1, IFT-AFT, Teamsters Local 700, and the Illinois Nurses Association.

- 6 -

However, during the pendency of the proceedings, this court entered its decision in *Heaton*, 2015 IL 118585, invalidating Public Act 98-599 as a violation of the pension protection clause. In light of this court's ruling, the City advised the circuit court that it would not proceed with its reserved sovereign powers affirmative defense.

¶ 21    The parties ultimately filed cross-motions for summary judgment. The State adopted the City's motion. Defendants argued that the Act does not diminish or impair benefits because it results in a "net benefit" for the Funds' participants and will save the Funds from an otherwise inevitable insolvency. The City additionally maintained that any payment of benefits owed prior to the Act was not the obligation of any government entity but, rather, was the obligation solely of the Funds themselves, and that under the Pension Code "participants' benefits [were] limited to sums on hand in the funds." Therefore, under the Act, the pension funds will be saved from insolvency and put on a path to full actuarial funding, making the Funds' participants "better off" than without the Act. Additionally, defendants argued that the modification of benefits under the Act is permissible as the product of a bargained-for exchange between the City and the labor unions.

¶ 22    On July 24, 2015, the circuit court issued its thorough ruling, declaring the Act unconstitutional. In rendering its opinion, the court found that the Act diminished pension benefits in violation of the pension protection clause in the same manner as the recent legislation struck down in *Heaton*. The court rejected the "net benefit" argument as "contrary to the pension protection clause, its purpose, and the Supreme Court's interpretation of it." The court reasoned that the argument rested on a misapprehension of the scope of the protections in the pension protection clause, disregarded settled distinctions between pension benefits and funding choices, and failed to account for the fact that the so-called "net benefits" are subject to legislative repeal at any time.

¶ 23    The court additionally rejected defendants' assertion that the Act was a valid bargained-for exchange, finding that (1) the unions were not acting as agents in a collective bargaining process, (2) the unions could not have represented the retired members while at the same time acting as representatives of the active employees, and (3) nothing in the process that led to the enactment of the Act barred the individual plaintiffs from asserting their constitutional rights or operated as a waiver of those rights. Lastly, the court held that the unconstitutional provisions of

the Act could not be severed and that the Act was therefore unenforceable in its entirety.

¶ 24    The circuit court subsequently made the express written findings under Illinois Supreme Court Rule 18 (eff. Sept. 1, 2006), required when a statute is declared unconstitutional. The City and the Funds then appealed directly to this court pursuant to Illinois Supreme Court Rule 302(a) (eff. Oct. 4, 2011), and the State joined the City's appeal. This court subsequently granted the City's motion to consolidate the appeals.

¶ 25                                    ANALYSIS

¶ 26    These consolidated appeals are procedurally before us as a result of the circuit court's ruling on cross-motions for summary judgment. See 735 ILCS 5/2-1005(c) (West 2014). When parties file cross-motions for summary judgment, they mutually agree that there are no genuine issues of material fact and that only a question of law is involved. *Gurba v. Community High School District No. 155*, 2015 IL 118332, ¶ 10. Thus, our review is *de novo*. *Id.*

¶ 27    The sole question of law presented for our review is whether Public Act 98-641 violates the pension protection clause set forth in article XIII, section 5, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5). That section provides: "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." *Id.*

¶ 28    This court has twice recently construed the plain language of this clause in *Kanerva v. Weems*, 2014 IL 115811, and *Heaton*, 2015 IL 118585. We have considered its object and purpose, and reaffirmed the scope of its protections, consistent with earlier holdings from this court and the appellate court since the pension protection clause was adopted in 1970.

¶ 29    As we have explained, under the clause, a public employee's membership in a pension system is an enforceable contractual relationship, and the employee has a constitutionally protected right to the benefits of that contractual relationship. *Heaton*, 2015 IL 118585, ¶ 46. Those constitutional protections attach at the time an individual begins employment and becomes a member of the public pension

system. *Id.* Thus, under its plain and unambiguous language, the clause prohibits the General Assembly from unilaterally reducing or eliminating the pension benefits conferred by membership in the pension system. *Id.* ¶ 46 & n.12.

¶ 30    Having reaffirmed these constitutional principles, this court explained in *Heaton* that the provisions in Public Act 98-599 designed to reduce annuity benefits, including the provisions which jettisoned the benefits related to the annual annuity increases, diminished "the value of retirement annuities" for current members. *Id.* ¶ 47; *id.* ¶ 27 (specifically referencing Public Act 98-599, the replacement of the "flat 3% annual increases to [retirees'] annuities" with a "variable formula" and elimination of "at least one and up to five annual annuity increases"). This court held that those provisions "contravene the clear requirements of article XIII, section 5." *Id.* ¶ 47. We explained that "there is simply no way that the annuity reduction provisions in Public Act 98-599 can be reconciled with the rights and protections established by the people of Illinois when they ratified the Illinois Constitution of 1970 and its pension protection clause." *Id.* Accordingly, we concluded that the General Assembly overstepped the scope of its legislative power, and we declared those provisions invalid. *Id.*

¶ 31    The provisions in Public Act 98-641 have the same impact. They reduce the value of annual annuity increases, eliminate them entirely for certain years, postpone the time at which they begin, and completely eliminate the compounding component. The Act expressly states that these changes "apply regardless of whether the employee was in active service on or after the effective date of this amendatory Act." 40 ILCS 5/8-174(a), 11-170(a) (West 2014). These modifications to pension benefits unquestionably diminish the value of the retirement annuities the members of MEABF and LABF were promised when they joined the pension system. Accordingly, based on the plain language of the Act, these annuity reducing provisions contravene the pension protection clause's absolute prohibition against diminishment of pension benefits, and exceed the General Assembly's authority.[5]

¶ 32    We are cognizant that in enacting Public Act 98-641, the General Assembly expressly relied on the exigent circumstances of a fiscal crisis that threatens the

_____

[5]Notably, under the new provisions, not only are the benefits of current employees and retirees diminished, the current employees are now required to contribute more to obtain the reduced benefits. However, we need not consider the additional impact of these increased contributions in this case.

Funds' solvency to justify its diminishment of benefits in the interest of the greater public welfare. We do not dispute the accuracy of those findings. However, we thoroughly considered and rejected this justification in *Heaton*. We explained that there was "no possible basis for interpreting the provision to mean that its protections can be overridden if the General Assembly deems it appropriate." *Heaton*, 2015 IL 118585, ¶ 75. To do so would require that we "ignore the plain language of the constitution and rewrite it to include 'restrictions and limitations that the drafters did not express and the citizens of Illinois did not approve.' [Citation.]" *Id.* We held that to accept the position "that reducing retirement benefits is justified by economic circumstances would require that we allow the legislature to do the very thing the pension protection clause was designed to prevent it from doing." *Id.*

¶ 33        Notwithstanding our holding in *Heaton*, that the annuity reducing provisions plainly violated the pension protection clause, and that exigent circumstances cannot serve as a basis for the General Assembly to unilaterally override those constitutional protections, defendants contend that Public Act 98-641 survives constitutional infirmity for two reasons: (1) the Act, when read as a whole, does not diminish or impair pension benefits but, instead, saves them in a manner that confers a "net benefit" or "offsetting benefit" to members; and (2) the Act was the result of a bargained-for exchange supported by consideration.

¶ 34                                    I. "Net Benefit"

¶ 35        Defendants argue that the Act provides an offsetting benefit to members because it rescues the Funds from insolvency and guarantees that the pensions will be paid, by imposing an enhanced statutory funding obligation on the City, by moving to a new method of actuarial based funding, and by providing statutory enforcement mechanisms. Distilled to its essence, defendants' argument is that the Act's new promise of financial stability offsets the diminishment of benefits, thereby conferring a benefit when viewed as a whole.

¶ 36        The argument starts from the flawed premise that the provisions of the Act that enhance the City's funding obligation or change the method of funding to fully fund the pensions are "benefits" entitled to constitutional protection. This notion conflicts with settled precedent. As we explained in *Kanerva*, the benefits protected by the pension protection clause include those benefits that are "attendant to

- 10 -

membership in the State's retirement systems" (2014 IL 115811, ¶ 41), including "subsidized health care, disability and life insurance coverage, eligibility to receive a retirement annuity and survivor benefits." *Id.* ¶ 39. Legislative funding choices, however, remain outside the protections of article XIII, section 5, as consistently explained by this court over the past 40 years in *People ex rel. Illinois Federation of Teachers v. Lindberg*, 60 Ill. 2d 266 (1975), *McNamee v. State*, 173 Ill. 2d 433 (1996), and *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220 (1998).

¶ 37   In each of those cases, the plaintiffs argued that certain statutory pension funding schemes or appropriations of pension funding were to be treated as enforceable contractual rights protected by the pension protection clause, and created a binding funding obligation. The plaintiffs asserted that the failure to adhere to those funding provisions diminished or impaired their contract rights under the pension clause. *Lindberg*, 60 Ill. 2d at 271; *McNamee*, 173 Ill. 2d at 436-37; *Sklodowski*, 182 Ill. 2d at 229. Particularly, in *McNamee*, the plaintiffs claimed that amendments to the statutory scheme "violated their constitutionally protected right to the 'benefit' of a more secure fund created by the prior funding method." *McNamee*, 173 Ill. 2d at 439. Notably, in both *McNamee* and *Sklodowski*, the State responded, relying on this court's precedent, that the "pension protection clause creates enforceable contractual rights only to receive benefits, not control funding" (*Sklodowski*, 182 Ill. 2d at 229), and "does not encompass how those benefits are funded" (*McNamee*, 173 Ill. 2d at 439).

¶ 38   This court agreed with the State and rejected the plaintiffs' claims. After an exhaustive review of the constitutional convention debates regarding the purpose of the clause, we explained that "[t]he framers of our constitution simply did not intend that [the pension protection clause] control the manner in which the state and local governments fund their pension obligations." *McNamee*, 173 Ill. 2d at 446. Rather, "the purpose of the amendment was to clarify and strengthen the right of state and municipal employees to receive their pension benefits, but not to control funding." *Id.* at 440. We held that the clause "creates an enforceable contractual relationship that protects only the right to receive benefits." *Id.* at 446. Thus, consistent with *Lindberg*, *McNamee* and *Sklodowski*, passing a funding statute that aims to provide full funding by increasing the multiplier used to determine the City's contribution, or by changing the method of funding to an actuarially based funding requirement to ensure the Funds reach 90% funding by 2055 and beyond does not create a "benefit" protected by the pension protection clause.

¶ 39    Furthermore, we reject the proposition that Public Act 98-641 evinces a legislative intent to establish an enforceable contractual right to full actuarial funding that would be protected against impairment by subsequent legislation. To address this argument, we begin with the understanding that "the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." *National R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985). These policies are "inherently subject to revision and repeal." *Id.* Otherwise, " 'the essential powers of a legislative body' " would be drastically limited. *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 34 (quoting *National R.R. Passenger Corp.*, 470 U.S. at 466); see also *Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 215 (1994) ("There is no vested right in the continuance of a law. The legislature has an ongoing right to amend a statute."); *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 858 n.4 (7th Cir. 2008) ("It is axiomatic that one legislature cannot bind a future legislature.").

¶ 40    Based on these principles, it is presumed "that laws do not create private contractual or vested rights, but merely declare a policy to be pursued until the legislature ordains otherwise." *Sklodowski*, 182 Ill. 2d at 231-32 (citing *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 104 (1990)). The presumption that a statute does not create contractual obligations is not overcome "absent some clear indication that the legislature intends to bind itself contractually," and that intention must be "clearly and unequivocally expressed." *National R.R. Passenger Corp.*, 470 U.S. at 465-66.

¶ 41    Despite the City's reliance on the General Assembly's stated purpose in enacting the legislation to save the Funds from insolvency and the inclusion of enforcement mechanisms, nothing in the Act's funding provisions expressly provides for an enforceable contractual right to an "actuarial funding guarantee." Indeed, the language in the enforcement provisions is qualified in many respects. 40 ILCS 5/8-173.1, 11-169.1 (West 2014). For example, the Act provides that the Funds may bring a *mandamus* action at their discretion if the City fails to make its required annual contributions, and limits any repayment plans to those that do not "significantly imperil[ ] the public health, safety, or welfare." 40 ILCS 5/8-173.1(b), 11-169.1(b) (West 2014). Nothing in that language supports a legislative intent to establish clearly and unequivocally an enforceable contractual right of the members of the Fund to an "actuarial funding guarantee." Accordingly, for all of these reasons, the statutory funding provisions are not a "benefit" that can be "offset" against an unconstitutional diminishment of pension benefits.

¶ 42 Finally, and most importantly, we reject the City's assertion that the funding provisions in the Act must be regarded as a "benefit" because they replace an illusory set of unfunded statutory promises. The City maintains that prior to the Act, members of the Funds only had a right to the money available in their respective funds upon retirement. The City's argument rests on section 22-403 of the Pension Code, which provides that "[a]ny pension payable under any law hereinbefore referred to shall not be construed to be a legal obligation or debt of the State, or *** city ***, but shall be held to be solely an obligation of such pension fund." 40 ILCS 5/22-403 (West 2012).

¶ 43 The City's contention, if adopted by this court, would be inconsistent with the plain meaning of the pension protection clause, would undermine our holding in *Heaton*, and would lead to an absurd and unjust result. Rather, as we have explained, the Illinois Constitution mandates that members of the Funds have "a legally enforceable right to receive the benefits they have been promised"—not merely to receive whatever happens to remain in the Funds. *Heaton*, 2015 IL 118585, ¶ 46; *Lindberg*, 60 Ill. 2d at 271 (holding that the pension protection clause was a guarantee that members of the pension system would receive pension payments when they became due at retirement). The whole purpose of establishing the clause was "to eliminate any uncertainty as to whether state and local governments were obligated to pay pension benefits to their employees." *Sklodowski*, 182 Ill. 2d at 228-29. The clause was "intended to force the funding of the pensions indirectly, by putting the state and municipal governments on notice that they are responsible for those benefits." *McNamee*, 173 Ill. 2d at 442. How the benefits would be financed "was a matter left to the other branches of government." *Heaton*, 2015 IL 118585, ¶ 16. Thus, the General Assembly and the City have been on notice since the ratification of the 1970 Constitution that the benefits of membership must be paid in full, and that they must be paid without diminishing or impairing them.

¶ 44 Since members of the Funds already have "a legally enforceable right to receive the benefits they have been promised" (*id.* ¶ 46), the clause already guarantees that pension participants will receive the money due them at the time of their retirement. By offering a purported "offsetting benefit" of actuarially sound funding and solvency in the Funds, the legislation merely offers participants in those funds what is already guaranteed to them—payment of the pension benefits in place when they joined the fund. To put it simply, in 10 years, the members of the Funds will be no less entitled to the benefits they were promised. Thus, the "guaranty" that the

- 13 -

benefits due will be paid is merely an offer to do something already constitutionally mandated by the pension protection clause. Since participants already enjoy that legal protection, we reject the notion that the promise of solvency can be "netted" against the unconstitutional diminishment of benefits.

¶ 45    To the extent that section 22-403 of the Pension Code purports to establish that MEABF and LABF members only have a right to amounts the Funds have on hand by virtue of the legislatively-prescribed funding choices, that section cannot overcome the constitutional guarantee. *Id.* ¶ 80 ("[A]ll [legislative] acts, contrary [to] or in violation of the constitutional charter, are void."). Section 22-403 was originally enacted in 1945 (see 1945 Ill. Laws 1670 (§ 3)), prior to the 1970 Illinois Constitution and, thus, prior to the establishment of a contractual relationship between employer and employee. See *Arnold v. Board of Trustees of the County Employees' Annuity & Benefit Fund*, 84 Ill. 2d 57, 60-61 (1981) (at that time, the retirement annuity provided to members of most pension funds was not characterized as contractual in nature). Thus, by declaring a contractual relationship rather than a gratuitous one, the pension clause established a legal obligation to pay pension benefits to the employees where previously there had been none. *Sklodowski*, 182 Ill. 2d at 228.

¶ 46    Section 9 of the Transition Schedule of the 1970 Illinois Constitution provides in pertinent part:

"The rights and duties of all public bodies shall remain as if this Constitution had not been adopted with the exception of such changes as are contained in this Constitution. All laws, *** not contrary to, or inconsistent with, the provisions of this Constitution shall remain in force, until they shall expire by their own limitation or shall be altered or repealed pursuant to this Constitution." Ill. Const. 1970, Transition Schedule § 9.

Thus, to the extent that section 22-403 is inconsistent with the mandate in the pension protection clause, it did not survive ratification of the Illinois Constitution. See, *e.g.*, *Kanellos v. County of Cook*, 53 Ill. 2d 161, 166-67 (1972) (referendum provision in pre-1970 statute invalid under section 9 where it conflicted with home rule powers granted under the 1970 Constitution).

¶ 47    Ultimately, the City's "offsetting benefit" theory rests on the proposition that what it deems as "modest" diminishments are necessary to prevent insolvency in the future. Although we recognize that fiscal soundness is important, the General

- 14 -

Assembly may not utilize an unconstitutional method to achieve that end. *Maddux v. Blagojevich*, 233 Ill. 2d 508, 528 (2009) ("If a statute is unconstitutional, courts are obligated to declare it invalid" and "[t]his duty cannot be evaded or neglected, no matter how desirable or beneficial the legislation may appear to be."). To allow such a construct to justify diminishing benefits would be merely an end run around the reserved sovereign powers argument, as explained in *Heaton*. The City's theory would allow the legislature "through its funding decisions, [to] create the very emergency conditions used to justify its suspension of the rights conferred and protected by the constitution." *Heaton*, 2015 IL 118585, ¶ 85. This is the very circumstance that the pension protection clause was intended to foreclose. To be clear, the constitution removed the option of unilaterally diminishing benefits as a means of attaining pension stability. Whether members of the Funds may be "better off" under the new terms of the Act despite the unconstitutional diminishment of their benefits, as defendants contend, is not for the General Assembly to decide unilaterally. The fundamental point here is that determination must be made, if at all, according to contract principles by mutual assent of the members, and not by legislative dictates.

¶ 48                        II. Bargained-for Exchange

¶ 49        The City next contends that the Act was not a product of unilateral action but, instead, codified a bargained-for exchange made between the City and the unions representing the Funds' participants. The City maintains that the legislation was the result of negotiations between the City and its unions, over several years. In support, the City presented the affidavit of Matthew Brandon, the Secretary/Treasurer and Chief of Staff of Service Employees International Union Local 73 (SEIU).

¶ 50        Brandon stated that "a working group drawn from the 31 MEABF and LABF member unions was formulated to participate in negotiations with city representatives pertaining to the terms of such legislation." Over a period of about two and a half years, representatives of the City "met with this working group to discuss developing a mutually beneficial solution to the pension crises." As a result of the negotiations, the City representatives and the unions' working group arrived at a proposal, which was presented to the legislature.

¶ 51 Brandon asserted that before the proposed legislation was presented to the General Assembly, elected representatives from the 31 unions met to determine whether the unions could reach a consensus to support the terms of the proposed legislation. As a result of the meeting, 28 of the 31 unions represented at the meeting voted in favor of the proposed legislation. Following the vote, union representatives met with legislators to confirm their support for the proposed legislation.

¶ 52 The affidavit presented by Brandon also refers to "an affiliated committee comprised of and established for the benefit of SEIU retirees," and states that he apprised the committee members of the "status and progress of the negotiations," and that he informed the committee of the "final terms" of the bill, and that no committee members voiced an objection to the proposed negotiated terms. The legislation was promoted as the "product of arms-length negotiations between the City of Chicago and the duly elected representatives of the unions that advocated on behalf of the union members and retirees."

¶ 53 Even taking as true the facts advanced to support the City's claim, we hold that as a matter of law, members of the Funds did not bargain away their constitutional rights in this process. To be sure, ordinary contract principles allow for the modification of pension benefits in a bargained-for exchange for consideration. *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99, 104-05 (1987) (pension rights can be modified "in accordance with usual contract principles"). As we explained in *Heaton*, the pension protection clause was not intended to prohibit the legislature from providing "additional benefits" and requiring additional employee contributions or other consideration in exchange. *Heaton*, 2015 IL 118585, ¶ 46 n.12. Likewise, nothing prohibits an employee from knowingly and voluntarily agreeing to modify pension benefits from an employer in exchange for valid consideration from the employer. *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d 833, 849 (1979); see also *York v. Central Illinois Mutual Relief Ass'n*, 340 Ill. 595, 602 (1930) ("one party to a contract cannot by his own acts release or alter its obligations. The intention must be mutual.").

¶ 54 In the context of the collective bargaining process for public employees, employees designate a particular union as their exclusive agent for collective bargaining negotiations. See 5 ILCS 315/6 (West 2014). The cases that defendants rely upon to support a bargained-for exchange argument involved agreements

reached through the collective bargaining process. See *Ballentine v. Koch*, 674 N.E.2d 292, 296 (N.Y. Ct. App. 1996) ("[B]ecause plaintiffs designated the PBA as their agent for the collective bargaining negotiations at issue here and were thus bound by its actions taken on their behalf during the negotiation process [citation], the PBA's waiver of the constitutional protections of [New York's pension protection clause] is valid as to plaintiffs ***."); *Schacht v. City of New York*, 346 N.E.2d 518, 519 (N.Y. Ct. App. 1976) ("Plaintiff, having designated the union to be her agent for collective bargaining purposes, is bound by agreements made by that union on her behalf.").

¶ 55 In this case, it is undisputed that the unions were not acting as authorized agents within a collective bargaining process. Thus, we need not resolve whether the vote taken by union representatives as expressed in the Brandon affidavit bound members of the Funds in a collective bargaining process. Rather, we agree with the trial court that "these negotiations were no different than legislative advocacy on behalf of any interest group supporting collective interests to a lawmaking body." The individual members of the Funds have done nothing that could be said to have unequivocally assented to the new terms or to have "bargained away" their constitutional rights. Accordingly, nothing in the legislative process that led to the enactment of the Act constituted a waiver of the Funds members' constitutional rights under the pension protection clause.

¶ 56                                    III. Severability

¶ 57 Finally, we must consider whether the invalid provisions may be severed from the remaining provisions of the statute, which is a question of legislative intent. *Heaton*, 2015 IL 118585, ¶ 91. We look first to the statute's own severability provision, which creates a rebuttable presumption of legislative intent. *Id.* ¶ 95. To rebut the presumption, the court must determine whether the legislature would have passed the law without the invalid parts. *Id.* We consider "whether the legislative purpose in passing the act is significantly undercut or altered by the elimination of those invalid sections." *Id.*

¶ 58 Applying these principles to the present case, the Act's severability provision specifies certain sections of the Act that are declared "mutually dependent and inseverable." Pub. Act 98-641, § 93 (eff. June 9, 2014). These sections include the provisions pertaining to the annual annuity increases, which we have found to be

- 17 -

unconstitutional, as well as the provisions pertaining to the City's financing obligations and the enforcement mechanisms. With respect to these sections, the severability clause provides, "If any of those provisions is held invalid other than as applied to a particular person or circumstance, then all of those provisions are invalid." *Id.*

¶ 59 The circuit court found that this expression of legislative intent was confirmed by the General Assembly's express findings along with the representations made by legislative proponents that the legislation intended to tie the reduction in employee benefits to the funding and enforcement provisions of the Act "as part of a unified package." Accordingly, the circuit court held that "the General Assembly would not have enacted Public Act 98-641 without the invalid provisions." The parties do not dispute the circuit court's conclusion, and we agree with the circuit court's assessment that the Act is unenforceable in its entirety.

¶ 60                                    CONCLUSION

¶ 61 For all of the foregoing reasons, the judgment of the circuit court declaring Public Act 98-641 to be unconstitutional and permanently enjoining its enforcement is affirmed.

¶ 62 Affirmed.